In the Matter of ANNETTE LA VALLE et al., Petitioners, v PETER A. A. BERLE, as Commissioner of Environmental Conservation of the State of New York, et al., Respondents.

Third Department, June 7, 1979

236

## APPEARANCES OF COUNSEL

*Norwick, Raggio, Jaffe & Kayser (Robert C. Stover* of counsel), for petitioners.

*Robert Abrams, Attorney-General (Francis J. Keehan, Shirley Adelson Siegel, Jeremiah Jochnowitz* and *Stanley Fishman* of counsel), for respondents.

## OPINION OF THE COURT

GREENBLOTT, J.

Petitioners, property owners in the Town of Woodstock, seek to annul a determination by the Commissioner of the Department of Environmental Conservation (En Con) which granted a real estate developer a State Pollutant Discharge Elimination System (SPDES) permit to discharge 30,000 gallons per day of treated domestic sewage from a proposed residential housing development into the waters of Tannery Brook at a point located in the Town of Woodstock, Ulster County.

Petitioners first contend that the commissioner's approval of the effluent limitation with an ammonia concentration of 2 milligrams per liter (2 mg/l) was arbitrary and unsupported by substantial evidence. The commissioner is authorized to issue a SPDES permit where he finds that the discharge will not contravene the "standards, criteria, limitations, rules and regulations adopted or applied by the department" (ECL 17-0701, subd 4, par a). Under ECL 17-0509 (subd 2), the minimum degree of treatment required for the discharge of sanitary sewage into surface water is "effective secondary treatment".[*] Petitioners concede that the ammonia concentration allowed in the SPDES permit complies with this minimum requirement. However, as petitioners point out, ECL 17-0509 (subd 2) goes on to provide that "additional treatment may be required consistent with the standards established for specific waters by the department pursuant to section 17-0301 or with standards, criteria, limitations, rules or regulations promulgated or applied pursuant to title 8 hereof" (see, also, ECL 17-0811, subd 5).

Pursuant to ECL 17-0301, Tannery Brook has been classified

---

[*] Effective secondary treatment means the "removal of substantially all floating and settleable solids and the removal of * * * at least eighty-five per cent of five day biochemical oxygen demand, or such other standard as may be adopted pursuant to the Act [Federal Water Pollution Control Act, US Code, tit 33, § 1251 *et seq.]"* (ECL 17-0509, subd 1).

"C(T)", meaning that it is a fresh water class "C" stream and that it is designated as a trout stream (6 NYCRR 861.2 [b], 861.4, Table 1, Item No. 83). 6 NYCRR 701.4, which establishes classes and standards for fresh waters, specifies that the pH standard of a class "C" stream "[s]hall be between 6.5 and 8.5". The provisions of note 1 under the quality standards for class "AA" waters, which are applicable to class "C" waters by express reference, state that waters with an alkalinity of 80 milligrams or above may have a stream concentration of ammonia of not more than 2.0 mg/l (6 NYCRR 701.4). The commissioner concluded that an effluent ammonia limitation of 2 mg/l with typical concentrations of 50 to 100 mg/l of alkalinity mixing with the natural waters with an alkalinity of approximately 20 to 30 mg/l and a pH in the range of 6.4 to 7.2 "would not reasonably be expected to synergistically toxify the ammonia and adversely impact the aquatic life in Tannery Brook".

■ Although a site-specific study of Tannery Brook was not conducted, the commissioner utilized the ammonia effluent limitation specified in En Con's intermittent stream policies. John Kwak, a senior sanitary engineer employed by the State, testified that the proposed level of ammonia treatment would meet the standards and criteria for a class C(T) stream and even a class B(T) stream. He further testified that the proposed effluent was "clean" enough to be discharged into virtually every water in the State, including a drinking water reservoir, and that the ammonia concentration would be nontoxic. Therefore, we are of the view that the commissioner's determination that the effluent limitation for ammonia set out in En Con's intermittent stream policy as proper was neither arbitrary nor unsupported by substantial evidence.

Petitioners also contend that the commissioner's approval of the applicant's discharge of 2.4 mg/l of phosphorus into Tannery Brook was arbitrary and unsupported by substantial evidence. The commissioner indicated in his findings of fact that the proposed effluent would be 0.6 pounds of phosphorus per day into Tannery Brook, and that it would be impractical and unwarranted to remove such a minute quantity of phosphorus. He concluded that although such a discharge "would not be expected to contravene the water quality criteria" of Tannery Brook, the phosphorus discharge should be limited to 0.6 lbs/day, the equivalent of 2.4 mg/l.

■ The regulations prescribing water quality standards for

class "C" waters do not mention specific phosphorus levels (see 6 NCRR 701.4, class "C" waters). However, Kwak testified that phosphorus removal is required where there is a discharge into a lake or impoundment, but that it is neither required nor warranted where, as here, the discharge is into a stream. Nevertheless, as an extra precaution, the approved permit was modified to provide an effluent limitation and a monitoring and reporting program for phosphorus. Thus, adding the effluent limitation on phosphorus to prevent the indiscriminate discharge thereof was not arbitrary and had a rational basis in the record.

■ We find no merit in petitioners' final contention that the commissioner's approval of the permit violates En Con's permit policy on dissolved oxygen. The regulations provide that for a class "C(T)" stream such as Tannery Brook, "[a]t no time shall the DO [dissolved oxygen] concentration be less than 5.0 mg/l." (6 NYCRR 701.4.) Here, the effluent limitations in the SPDES permit require a minimum dissolved oxygen level of greater than 7.0 mg/l.

Petitioners, relying on En Con's calculations set forth in the footnote to table 1 of the intermittent stream policy, argue that the permit would result in a stream standard containing only 3.0 mg/l of dissolved oxygen rather than 5.0 mg/l required by the regulations for class "C(T)" waters. Petitioners' reliance upon the footnote, however, is misplaced. We agree with the commissioner that the footnote merely sets forth an example to demonstrate how a stream standard of 3.0 mg/l of dissolved oxygen may be achieved if an allowance of only 1 mg/l is made for reaeration in the stream bed. Such an allowance is based upon low assimilation capacity characteristics found in class "D" streams. Here, however, since Tannery Brook is a class "C(T)" stream, it has, according to the commissioner higher assimilation capacity characteristics and, therefore, the requisite stream standard of dissolved oxygen will be provided by reaeration in Tannery Brook. This appears reasonable and, therefore, we cannot say that the commissioner's determination in this regard was arbitrary.

The record indicates that the effluent limitations specified in the permit approved by the commissioner were the strictest ever imposed. The engineer for the State testified that it was the "strictest permit" that he had ever had a chance to write or review, and that the effluent was "clean" enough to be discharged into virtually every river, lake or stream, including

a drinking water reservoir. During the course of the public hearings, some of the proposed effluent limitations were made even stricter to protect the water quality of Tannery Brook. The Legislature has vested the commissioner and En Con with the authority and power to insure that reasonable methods are undertaken to prevent and abate pollution of the State's waters. It is an area requiring specialized knowledge and scientific expertise, and, upon this record, we cannot say that the commissioner's determination is arbitrary, capricious and unsupported by substantial evidence. We have examined petitioners' other contentions and find them unpersuasive.

The determination should be confirmed, and the petition dismissed, without costs.

MAHONEY, P. J., SWEENEY, MAIN and MIKOLL, JJ., concur.

Determination confirmed, and petition dismissed, without costs.