TOWN OF HEMPSTEAD, Petitioner, v ROBERT FLACKE, as Commissioner of the New York State Department of Environmental Conservation, Respondent.

Second Department, July 24, 1981

#### APPEARANCES OF COUNSEL

*W. Kenneth Chave, Jr., Town Attorney (Stephen Leiter* of counsel), for petitioner.

*Robert Abrams, Attorney-General (John G. Proudfit* of counsel; *Michael A. Bardee* on the brief), for respondent.

#### OPINION OF THE COURT

*Per Curiam.*

On November 16, 1979 petitioner Town of Hempstead, on behalf of the Roosevelt Field Water District (RFWD), filed an application with the Department of Environmental Conservation (DEC) for a permit to deepen two wells in the northwest corner of the Roosevelt Field Shopping

Center. The town proposed to use the wells for three years to meet peak demands within the RFWD. On March 7, 1980, after meetings of interested parties, DEC issued to the town a conditional approval to deepen one of the wells.

The City of Long Beach contested DEC's issuance of this permit. By judgment entered June 25, 1980, the Supreme Court, Nassau County (PANTANO, J.), ruled, *inter alia*, that DEC's issuance of the March 7, 1980 permit was "reasonable and proper and neither arbitrary nor capricious". On appeal *(City of Long Beach v Flacke*, 77 AD2d 638, mot to dismiss app granted 51 NY2d 878), this court vacated the permit and remitted the matter to DEC for a full hearing. After due notice, a hearing was held in February, 1981, before Administrative Law Judge ROBERT P. O'CONNOR. At the hearing the town modified its original application to request permission to deepen only one well, RFWD well 3, into the Lloyd aquifer for a period not to exceed one year. Judge O'CONNOR incorporated the entire record of an earlier hearing, held in July, 1980 to determine the duration of the March 7, 1980 permit, into that of the February, 1981 hearing.

The hearing report of the Administrative Law Judge contained 27 findings of fact, which the respondent Commissioner of the New York State Department of Environmental Conservation adopted in their entirety in his decision. For purposes of this proceeding, both parties also accept those findings.

Briefly summarized, the Administrative Law Judge found that there are four major underground reservoirs, or aquifers, from which the inhabitants of Long Island draw their fresh water. The uppermost aquifer is the glacial aquifer, followed in descending order by the Jameco aquifer, the Magothy aquifer and finally the Lloyd aquifer, the deepest and purest of the four. In recent years, a combination of factors resulting from population increases and land use policies has caused both a decrease in recharge of rain and waste water back into the aquifers and an increase in the amount of water pumped out of the aquifers. This, in turn, had led to saltwater intrusion into the portions of the glacial, Jameco and Magothy aquifers lying under

the southernmost part of Nassau County. The point of saltwater intrusion into the Lloyd aquifer is being maintained at a point farther south, leaving the Lloyd as the only source of fresh water for the "barrier beach" communities of Long Beach, Lido Beach and Point Lookout. Notwithstanding conservation efforts in these communities, future demand for Lloyd water is expected to increase. A major increase in pumpage from the Lloyd could cause the point of saltwater intrusion to move shoreward, jeopardizing the water supplies of the barrier beach communities.

The upper three aquifers have also suffered chemical contamination. The Lloyd, separated from the Magothy by a 100-foot thick layer of Raritan clay, had been regarded as immune, but has recently exhibited some organic contamination. The Administrative Law Judge noted: "With the increased presence of various types of pollutants in many of Long Island's existing water supply wells, increased pressures to use alternate sources of water can be anticipated. Since the aquifers beneath Long Island are the sole sources of drinking water for the Island's inhabitants, any alternate supplies, aside from water which might be produced in the future from desalinization plants, must be obtained from uncontaminated areas in the Magothy aquifer, from contaminated areas in the Magothy aquifer from which the water can be treated to potable standards or from the Lloyd aquifer. The potential for additional applications to tap Long Island's aquifers, particularly the limited Lloyd aquifer, dictates a need for extreme care to be taken in evaluating new water supply applications."

RFWD is served by wells drilled into the Magothy aquifer. Wells 1, 2 and 3 are west of the Meadowbrook State Parkway, in the vicinity of the Roosevelt Field Shopping Center. Wells 4 and 5, and a newer well designated Dibblee, are east of the Parkway, as is a one-million-gallon elevated storage tank. There are other wells within the district, owned by RFWD and private parties, used solely for non-potable purposes. At present, only three RFWD potable wells are in service: numbers 1 and 5 and the Dibblee well. Each has a capacity of 1,300 to 1,400 gallons per minute or two million gallons per day. Well 3 has been closed since 1978 because of contamination; well 2 was closed for the

same reason in 1979, but was returned to service a year later for three months until the contamination again reached an unacceptable level. Well 1 is, therefore, the only working well in the vicinity of the shopping center. That well, plus water transported from the eastern part of the district, can meet the demand of the shopping center even during peak summer periods, which could reach 3,000 gallons per minute. However, to insure adequate fire protection, a capacity of 5,500 gallons per minute is required, a flow which RFWD cannot supply to the shopping center. If well 1 were to be taken out of service, RFWD could not even meet normal system demand for the shopping center.

Because of the difficulty in obtaining additional water from neighboring districts and the inadequate connecting main between the eastern and western portions of RFWD, the district concluded that an extension of well 3 was the only practical short-term solution to the deficiencies in the shopping center area.

Within RFWD, up to 50% of the system's capacity may be used for cooling (a nonpotable use) during the summer. The Administrative Law Judge found that further isolation of cooling systems from the potable system could not be completed within the shopping center by the summer of 1981 and would not be practicable elsewhere in the district. Although RFWD has commenced development of new sources of supply, none of these is likely to be completed by the summer of 1981.

The proposed extension of well 3 would take six to eight weeks, and could be done in a manner which would prevent any passage of water from the Magothy to the Lloyd. Well 3, as extended, would be available to supplement existing sources of supply on a last on, first off basis, subject to strict conditions and monitoring by local, State and Federal agencies, and would be retired from service on October 15, 1981, except for testing and observation purposes.

A proposed master water plan for Nassau County stated that "Saltwater encroachment is the major constraint on the use of the Lloyd Aquifer". The plan recommended controlled development of Lloyd wells to be used temporarily as an aid to obtaining more data about the Lloyd and its capacity.

The commissioner adopted all but two of the Administrative Law Judge's conclusions. The commissioner disagreed with the conclusion that (1) given RFWD's obligation to provide sufficient supplies of water to meet minimum fire flows to protect life and property within the district and the possibility that wells 1 and 2 could be closed for the summer, the project is justified by public necessity; and (2) the proposed project is in accord with the criteria set forth in ECL 15-1503.

In denying the application, the commissioner emphasized the finding that an unlimited, uncontaminated supply of water on Long Island is not certain, and that efforts must be taken now to assure that potable water supplies remain available. He rejected the conclusion that the project was justified by the public necessity as resting on too narrow a definition of that term. He ruled that a determination of public necessity must entail a consideration of (1) the nature of the present use (potable or nonpotable) and (2) the importance of the water supply source. Applying these criteria to the instant application, the commissioner concluded: "In examining the Hearing Report it appears that the principal user of the RFWD is Roosevelt Field Shopping Center. Moreover, the primary use of water during the term of the proposed permit is for cooling purposes. In addition, due to deficiencies in the water distribution system within the RFWD, adequate separation of water distribution lines for potable and nonpotable uses does not presently exist thereby preventing the segregation of Lloyd derived water for priority use. Furthermore, the paramount importance of the Lloyd as a source of uncontaminated potable water for Long Island is undeniable."

In reviewing the actions of an administrative agency, this court may only annul a determination if it is not rational—if it is arbitrary and capricious or unsupported by substantial evidence (see *Matter of Pell v Board of Educ.*, 34 NY2d 222, 231). We may not substitute our judgment for that of the commissioner (see *Matter of New York Water Serv. Corp. v Water Power & Control Comm. of Dept. of Conservation of State of N.Y.*, 257 App Div 590, 594, mod on other grounds 283 NY 23). The commissioner's determination is entitled to great weight, especially where,

as here, it is in an area requiring specialized, scientific knowledge (see *Matter of La Valle v Berle*, 68 AD2d 235, 240).

In the matter before us, the record contains substantial evidence to support the determination. The bulk of the findings of fact indicate little danger to the Lloyd aquifer if well 3 is extended into it. Nonetheless, the findings also indicate that the other three aquifers on Long Island have suffered significant saltwater intrusion and that a major increase in withdrawals from the Lloyd could cause the same problem in that aquifer. The Lloyd is the deepest and purest aquifer on Long Island and is the sole source of potable water for the barrier beach communities, which are primarily residential. In addition to the problem of saltwater intrusion, there is also the problem of chemical contamination, which has significantly affected the upper three aquifers. The detection of such contamination in the Lloyd (previously thought to be impermeable because of the thick layer of Raritan clay separating it from the Magothy) "dictates a need for extreme care to be taken in evaluating new water supply applications".

Even though the proposed well extension would draw very limited quantities of water from the Lloyd, it must be borne in mind that the City of Long Beach, as a result of contemplated residential growth, as well as other development, will require greater quantities of water from the Lloyd in the near future, notwithstanding its having taken major conservation measures.

During the summer (the period during which the proposed extended well would be operating, if at all, to ensure adequate flow to fight a fire at the Roosevelt Field Mall), 40 to 50% of RFWD's capacity is used for cooling. While use of nonpotable water for this purpose or the purchase of water from neighboring districts is not practicable for the near future, petitioner refuses to accept the possible solution of reducing or prohibiting the use of air conditioning in the district on those days when the deficit proposed to be met by the extended well 3 would occur. While such restrictions would no doubt have a significant adverse impact on the local economy, a deficit of sufficient magnitude

should not occur on many days, and, if wells 1 and 2 are available, the deepened well 3 would not be required at all.

Although modern construction techniques would minimize the possibility of contamination of the Lloyd by the Magothy during the extension of well 3, it must be noted that there has already been one serious construction accident involving well 3. While this accident did not cause any leakage, it does raise the possibility that future accidents may occur, possibly with more disastrous results. The imposition of stringent conditions on the use of the deepened well 3 is also an acknowledgment that its use could potentially harm the Lloyd acquifer.

We must accept the commissioner's determination as to what would meet the statutory requirement of "public necessity" (ECL 15-1503, subd 2) unless it is irrational or unreasonable (see *Matter of Lumpkin v Department of Social Servs. of State of N. Y.*, 45 NY2d 351, 356, app dsmd 439 US 1040). In his application of the term "public necessity", the commissioner properly did not consider the interests of those beyond the area having a direct stake in the future of the Lloyd (cf. *Matter of Ton-Da-Lay v Diamond*, 44 AD2d 430, 435-436, apps dsmd 35 NY2d 789). The statute itself mandates consideration of, *inter alia*, "whether the project is just and equitable to all affected municipalities and their inhabitants and in particular with regard to their present and future needs for sources of water supply" (ECL 15-1503, subd 2). It is this factor (whether considered separate from or subsumed by that of public necessity) which the commissioner articulated in his decision to reject the contrary conclusion of the Administrative Law Judge that the permit should be issued. The commissioner's conclusion was rational, based on a proper weighing of RFWD's contingent, short-term need for nonpotable water against the long-term needs of the barrier beach communities (and perhaps, eventually, all of Long Island) for pure Lloyd water.

We have examined the other contentions of the parties and find them to be without merit.

MOLLEN, P. J., TITONE, MANGANO and BRACKEN, JJ., concur.

Determination of the Commissioner of the New York State Department of Environmental Conservation, dated May 1, 1981, confirmed and proceeding dismissed on the merits, without costs or disbursements.