ROBERT F. FLACKE, as Commissioner of Environmental Conservation of the State of New York, Appellant, and TOWN OF ONONDAGA, Intervenor, v ONONDAGA LANDFILL SYSTEMS, INC., Respondent.

Fourth Department, December 20, 1985

### APPEARANCES OF COUNSEL

*Robert Abrams, Attorney-General (Douglas Ward* of counsel), for appellant.

*Costello, Cooney & Fearon (Raymond D'Agostino* of counsel), for intervenor.

*Hiscock & Barclay (Robert Barrer* of counsel), for respondent.

*Wildridge, Rosenberg & Levy (Robert Wildridge* of counsel), receiver.

### OPINION OF THE COURT

DENMAN, J.

The Commissioner of the Department of Environmental Conservation (DEC) challenges an order of Supreme Court which approved a plan submitted by a court-appointed receiver for closure of a landfill operated by the Onondaga Landfill Systems, Inc. (OLSI), but deleted a provision which DEC had made a condition of its approval. The DEC would require a $710,000 interest-bearing fund to be established to provide for postclosure monitoring and maintenance and possible replacement of a polyvinylchloride (PVC) membrane which is to be placed over the site in order to prevent leachate from filtering through the landfill and contaminating the groundwater. The court found that such requirement was not economically feasible, not required by the regulations or the factual circumstances presented and that therefore such requirement was arbitrary and capricious. We find, to the contrary, that the condition imposed by the DEC is consistent with its regulations, supported by expert opinion, reasonable under the circumstances and economically feasible.

#### HISTORY OF THE LANDFILL

OLSI purchased the landfill site in 1977 and applied for a permit to operate. The Commissioner denied the permit and ordered OLSI to submit plans for closing the landfill because

of its noncompliance with applicable regulations. He found that the placing of refuse directly on the site's limestone bedrock instead of on the required five-foot layer of fill meant that water from the landfill would not be purified before leaching through to the water table and thus that continued operation threatened to contaminate the groundwater. We found that determination to be supported by substantial evidence (Onondaga Landfill Sys. v Flacke, 81 AD2d 1024).

When OLSI made no attempts at closure, DEC commenced this action to enforce its order. On DEC's motion the court appointed a temporary receiver to wind down the landfill operation, to prepare and submit to the court and the Commissioner a closure plan consistent with applicable regulations and to close the landfill as soon as enough funds were accumulated to finance closure. The receiver retained an engineering firm to design a closure plan and, in June 1983, such plan was submitted to the DEC. Among other things, the plan called for installation of a 20-mil PVC membrane to cap the 65-acre landfill, such cap to be encased between two 12-inch layers of fill in order to prevent or minimize groundwater contamination. The DEC found the plan to be generally acceptable but recommended that a 30-mil membrane be used, that a program be implemented to monitor the integrity of the cap, and that plans be made for replacement of the cap at the end of its life, which it estimated to be 20 years. DEC also recommended that a study be made of the possibility of financing closure, at least in part, with royalties from the sale of methane gas recovered from the property. Subsequently, the engineers submitted a revised plan incorporating the cap replacement and postclosure monitoring recommendations and providing for establishment of a $710,000 sinking fund to finance the costs. Of that $710,000, $383,000 was estimated to be the cost of cap replacement and $327,000 the cost of annual maintenance. The engineers proposed that such costs be financed by the estimated $400,000 annual net proceeds from the sale of methane gas. The Commissioner approved the plan subject to the conditions that cap replacement and monitoring for 20 years be accepted and that a sinking fund for those purposes be established.

The receiver moved for an order approving this revised closure plan. Supporting his motion were the affidavits of the receiver and the engineers stating that the plan complied with the DEC's landfill regulations and that imposition of the replacement cap condition was not unreasonable. Neverthe-

less, the receiver posited that the initial cap would probably be sufficient, that there were insufficient funds in court-established accounts to finance cap replacement and that the additional projected costs might delay closure. OLSI opposed the motion, arguing that it did not have sufficient funds for the $710,000 required to fund the monitoring, maintenance and cap replacement, and contended that the DEC had no authority to impose those conditions upon the court-appointed receiver's closure plan.

The DEC urged the court to approve the plan incorporating its conditions, arguing, on the basis of its expertise and as supported by various writings in the field, that monitoring and cap replacement were necessary. It contended that the proposed PVC cap was of marginal thickness and had a design life of only 20 years, that many factors could result in its failure, that the DEC in particular and the industry in general had limited experience with the use of such caps, that the site was extremely unsuitable for disposal of solid waste, that any leachate would contaminate the groundwater, that this potential would exist beyond the 20 years of the cap's estimated life, and that the provision for establishment of a sinking fund to finance cap replacement was therefore reasonable.

Treating the receiver's motion as though it were a CPLR article 78 proceeding for review of an agency determination, the court found the Commissioner's determination that cap replacement was necessary to be unreasonable, arbitrary and capricious, based on speculation, in excess of the requirements of the DEC's own regulations, and unmindful of the economic feasibility of the proposal. It therefore approved the closure plan including the 20-year monitoring provision, but deleted the requirement for replacement of the PVC cap and the sinking fund needed to finance it. Subsequently, the parties agreed on a plan to finance the cost of a 20-year monitoring program. Thus the only issue to be determined is the propriety of the court's deletion of the requirement of cap replacement and establishment of a fund for that purpose.

### DEC JURISDICTION

Both defendant and the receiver maintain that the DEC relinquished jurisdiction over the final plan for closure when it acceded to the order by which the court assumed continuing jurisdiction and appointed a receiver to oversee the closing of

the landfill operation. That position is refuted by the terms of the order which required the receiver to prepare and submit to the court and to the Commissioner a plan for closure and specifically provided "for review and approval by the Department" and "[implementation of] the plan as approved."

Even if the court had concurrent jurisdiction with the DEC for approval of the plan, the court must accede to the decision of the Commissioner under the doctrine of primary jurisdiction. Under that doctrine, the courts will not resolve a question within the jurisdiction of an administrative agency where the issue demands special knowledge and expertise and where it is essential to have uniformity of ruling in carrying out the purposes of the regulations the agency is administering. "Where the courts and an administrative agency have concurrent jurisdiction over a dispute involving issues 'beyond the conventional experience of judges' * * * the court will 'stay its hand until the agency has applied its expertise to the salient questions' " *(Engelhardt v Consolidated Rail Corp., 756 F2d 1368, 1369)*. Since the Legislature has vested the DEC with the power to adopt and promulgate rules governing the operation of solid waste management facilities, it is the DEC, not the court, which must make the initial determination as to whether the closure plan was developed in accordance with its regulations contained in 6 NYCRR part 360. The court's review of that determination is then limited to whether it is "irrational or unreasonable" *(Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 459)*.

### THE REQUIREMENT OF A CAP REPLACEMENT AND ESTABLISHMENT OF A FUND THEREFOR WAS NOT ARBITRARY AND CAPRICIOUS

In holding that the Commissioner's determination was arbitrary and capricious, the court concluded that imposition of a condition requiring cap replacement and a fund therefor exceeded the requirements of the DEC's own regulations. In assessing whether administrative action is contrary to law, an agency's interpretation of its own regulations is given "almost the force of judicial interpretation" and will be upheld so long as it is not irrational or unreasonable *(see, Matter of Lezette v Board of Educ., 35 NY2d 272, 281)*. If a determination is consistent with regulations which are themselves enacted pursuant to a valid delegation of legislative authority, the administrative determination will not be disturbed *(see, Town*

*of Junius v Flacke,* 71 AD2d 423, 427-428, *affd* 53 NY2d 616). The condition imposed by the Commissioner was consistent with DEC regulations and with his prior determination as affirmed by this court *(Onondaga Landfill Sys. v Flacke,* 81 AD2d 1024, *supra).* The regulations prohibit operation of a solid waste management facility in such manner that leachate will be allowed to contaminate the groundwater (6 NYCRR 360.8 [a] [3]). 6 NYCRR 360.8 (a) (21) provides as follows: "The owner or operator of any active or inactive facility, either with or without a permit under this Part, shall, upon permanent termination of use, properly close and maintain such facility so as to prevent adverse environmental or health impacts such as, but not limited to, contravention of surface or ground water quality standards, gas migration, odors, and vectors. Permanent termination of use shall include those situations where a facility has not received solid waste for more than one year, where a permit has automatically expired pursuant to section 360.4 (f) of this Part, and termination of use resulting from permit denial, order of the commissioner or of a court. Specific closure measures are subject to approval of the department. In the case of landfills, minimum closure measures shall include at least two feet of final cover, an established grass cover crop, and sufficient grading to direct water off the fill area so as to minimize infiltration and preclude ponding." 6 NYCRR 360.8 (b) (1) (vii) (e); (viii) provide that the required "final cover" shall be "designed, graded and maintained" to "reduce to a minimum infiltration of water into the solid waste cells". While 6 NYCRR 360.1 (d) (25) defines "final cover" as a soil cover of 24 inches, 6 NYCRR 360.8 (b) (1) (xvii) provides that proposed landfills and modifications of existing landfills "shall require a natural or artificial liner that restricts infiltration to the equivalent of five feet of soil at hydraulic conductivity of $10^{-5}$ cm/sec or less and shall also require a system for leachate collection and storage." The last paragraph of 6 NYCRR 360.8 (b) (1) provides that the "department may impose additional requirements * * * including * * * requirements for leachate collection system, impervious liners, and impervious caps."*

With respect to the Commissioner's authority to impose the particular condition at issue here, the regulations set forth

---

* Although 6 NYCRR part 360 has been modified from time to time, it has always contained the basic provisions prohibiting operation of landfills in violation of requirements governing "cover" of landfills.

only minimal closure standards and expressly empower the Commissioner to impose additional requirements where necessary. The regulations prohibiting operation or closure of a landfill in such manner as to contaminate the groundwater, the specific requirement that final cover be maintained so as to reduce to a minimum infiltration of water into the solid waste cells, and the authorization to impose additional requirements on landfills, including a requirement concerning the use of impervious caps, all contemplate the imposition of more stringent conditions by the Commissioner where there exists a threat of groundwater contamination. It was thus not contrary to law for the Commissioner to exercise his authority by imposing the additional provision for establishment of a fund to finance cap replacement.

The administrative agency is to be given great deference in matters within its expertise and delegated power, and its determination should be upheld unless unreasonable (*State Off. of Drug Abuse Servs. v State Human Rights Appeal Bd.,* 48 NY2d 276, 284; *Matter of La Valle v Berle,* 68 AD2d 235, 240). There is ample support for the reasonableness of the Commissioner's determination that a fund for cap replacement is necessary. The agency's experts averred and presented literature demonstrating that the proposed PVC membrane might prove too thin, that it has a design life of 20 years at most, that a number of factors could cause it to fail, and that there is insufficient experience and knowledge as to the performance of PVC membranes for these purposes. The DEC's prior determination to close this landfill predicted that any leachate from the site "will violate the groundwater standards." The DEC's experts were of the opinion that the groundwater requires more than 20 years' protection and that "failure of the cap, either before or after the 20 year period, will likely result in violation of groundwater standards." While expressing his reservations about the necessity of a replacement cap, the receiver's engineer conceded the validity of the DEC's concern about the durability of the membrane and expressed the opinion that the DEC's insistence on a replacement cap was not arbitrary and capricious. Therefore, according to the only expert testimony before the court, the provision for a replacement cap was eminently reasonable.

### FINANCING THE CAP REPLACEMENT

The court's determination that it was unreasonable for the

DEC to require that provision be made to replace the cap in 20 years was based in part on the court's conclusion that OLSI lacks the funds to pay for a replacement cap. ECL 27-0703 requires that rules and regulations promulgated pursuant to the statute "shall give due regard to the economic and technological feasibility of compliance therewith." The court found that the same limitation applies to closure measures.

Initially, we note that, although the court found OLSI lacking in funds, there is no support for that determination in the record. Even if there were, however, regard for "economic feasibility" is not to be equated with regard for an operator's financial ability. The inclusion of that standard was meant to insure that the test of cost effectiveness would be incorporated in the regulations promulgated to protect the environment. The preamble to ECL article 27, title 7 includes a statement that "[i]t is the purpose of this act to assure that solid waste management is conducted in a safe, sanitary, efficient, economic and environmentally sound manner" (L 1973, ch 399, § 1). That language was repeated in the Governor's memorandum (1973 NY Legis Ann, at 149). The words "efficient" and "economic" clearly connote cost effectiveness, not the ability to pay. It would defeat the whole purpose of the regulatory scheme if the DEC's requirements had to be measured according to the financial capabilities of those being regulated.

The court thus erred in substituting its judgment for that of the agency and in deleting from the closure plan the Commissioner's requirement for a sinking fund to finance cap replacement.

Accordingly, the order should be modified to include a condition that a fund be established to finance cap replacement and as so modified, it should be affirmed.

DILLON, P. J., CALLAHAN, PINE and SCHNEPP, JJ., concur.

Order unanimously modified, on the law and facts, and, as modified, affirmed, without costs, in accordance with opinion by Denman, J.