OPINION OF THE COURT
Harold J. Hughes, J.
The petition will be dismissed.
Petitioner operates a wet process cement manufacturing plant in Catskill, New York. The plant employs 140 people and pays over $550,000 in local taxes. The raw materials used to make cement are limestone, red shale, water and gypsum. The minerals in the limestone and red shale are silica, alumina, iron and calcium. The manufacturing process involves combining water with crushed limestone and red shale resulting in slurry, which is placed into a kiln and heated at temperatures in excess of 2400 degrees Fahrenheit. This process transforms the slurry into a product called cement clinker.
The Department of Environmental Conservation (DEC) implements article 27 of the Environmental Conservation Law which, in part, covers the handling, transportation and disposal of solid waste. During 1988, the Legislature enacted section 27-0106 (1) of the Environmental Conservation Law which sets the State solid waste management priorities, and *654 directs that the reuse or recycling of waste is to take precedence over incineration or land filling. DEC implemented this legislative mandate by creating the Beneficial Use Determination (BUD) program set forth in 6 NYCRR 360-1.2 (a) (4) (former [VII]) and 360-1.2 (a) (former [5]). The BUD program exempts certain materials used in the manufacturing process to replace other materials from the broad definition of solid waste. This exemption allows the users of BUD materials to escape the comprehensive regulatory requirements of 6 NYCRR part 360. Under the former regulation, the entity seeking to use the material was required to submit a petition to the regional solid waste engineer for the administrative region of the department in which the material was to be used which set forth the following information (6 NYCRR 360-1.2 [a] [former (5)]):
"(i) [a] description of] the proposed method of application or use of the byproduct or waste;
"(ii) [the submission of the] chemical and physical characterizations of the byproduct or waste and of each intended finished product;
"(iii) [a] demonstration] that there is a known or potential market for the intended use of the byproduct or waste; and
"(iv) [a] demonstration] that the intended use will not adversely affect the public health and safety, and the environment”.
This CPLR article 78 proceeding involves the rejection of six BUD petitions submitted by petitioner. Four of the petitions sought to substitute waste water from other manufacturing processes in place of Hudson River water. Although the waste water would contain contaminants ranging from 2% to 20% of the water, the petitioner asserted that the use of the waste water would not expose its employees or the public to hazardous materials or increase the emission of any air contaminants. The fifth petition sought to use ash residue from municipal solid waste incinerators as a raw material substitute for red shale. The sixth petition requested the use of coal tar contaminated soil as a raw material in the cement manufacturing process.
The petitioner argued that the use of waste materials had become a major competitive factor in the cement industry. The petitioner pointed out that the recycling of the materials would divert waste that would otherwise take up landfill space, and would preserve virgin materials and river water. *655 Petitioner contended that the use of the waste water would reduce its energy costs by more than 50% and reduce its need to periodically treat its Hudson River water intakes for zebra mussel infestation. Petitioner explained that using the contaminated soil and incinerator ash would effect tremendous cost savings in the operation of its plant. Petitioner lobbied extensively for approval of its petitions, arguing forcefully that its proposals constituted no environmental threat, and overregulation by DEC contributed to the hostile business environment in New York resulting in the loss of manufacturing jobs. Petitioner hinted that without the requested relief, its manufacturing plant would not be economically viable, and the loss of 140 jobs and the economic contributions the plant makes to its community were at stake. On October 15, 1993, DEC issued its determination denying the six BUD petitions for the following reasons:
"In the case, the contaminants in the wastewaters will either be incorporated into the product or end up in the process effluents (i.e., air emissions or kiln dust). Since these contaminants are not necessary ingredients to the manufacture of cement, and have no other useful purpose when added to the product, they must be considered to have been disposed and not beneficially used. Accordingly, the substitution of wastewaters for river waters in the cement manufacturing process must be viewed as a form of wastewater disposal. Therefore, the Department hereby finds that these proposed uses do not constitute beneficial uses and are, therefore, not exempt from regulation under Part 360.
"Similarly, petitions for the use of solid waste incinerator ash and coal tar contaminated soils (both proposed by Lehigh as substitutes for red shale) are considered forms of disposal since the contaminant levels present in these materials significantly exceed that of the analogous raw materials (red shale) for which they are to be substituted. Therefore, the Department hereby finds that these proposed uses also do not constitute beneficial uses and are, therefore, not exempt from regulation under Part 360”.
In this CPLR article 78 proceeding petitioner makes the following arguments: DEC failed to follow its own regulations by focusing solely on the existence of contaminants, a criterion for BUD approvals not found in the regulations; DEC acted in an arbitrary and capricious manner by not following its own prior decisions approving the use of recycled materials containing contaminants; the new "contaminant” standard *656 was not properly enacted as a regulation; and, DEC’s determination is arbitrary and capricious because the use of the materials does not constitute an environmental threat and benefits society. Petitioner points out that its petitions met the four standards set forth in the regulation.
DEC responds that after the promulgation of the BUD regulations in December of 1988, it began to receive a rapidly increasing number of BUD petitions for uses of solid waste in novel ways. A fear arose in the Department that the BUD program was being used to "end run” the comprehensive waste disposal program by enabling manufacturers such as petitioner to use their incinerators to dispose of industrial waste without being subject to the safeguards in the permitting and regulatory rules. The Department encouraged BUD applicants to utilize the case-by-case process of 6 NYCRR 360-1.2 (a) (former [5]) which enabled it to determine whether the particular proposed use of the material constituted a bona fide substitution of one material for another, or whether the predominate use of the material was in the nature of disposal. In evaluating BUD petitions DEC considered: whether the contaminants and the waste material served any purpose in the manufacturing process or the end product; if the level of contaminants exceeded the levels of contaminants in the replaced raw materials; and, whether the use of the waste material was actually a means of disposal. DEC concedes that some of its earlier approvals may not conform to its ruling upon these six applications, but argues that this results from its greater sophistication in implementing the Legislature’s mandate. It factually distinguishes other prior rulings raised by petitioner.
There are serious public policy concerns raised by the parties to this proceeding, including whether overregulation is driving manufacturers out of New York State and whether certain industries are attempting to circumvent environmental protections by using the BUD process to incinerate industrial waste. Determination of such policy questions is not the domain of the courts. Resolution of these important matters belongs with the legislative and executive branches, and ultimately the public.
Turning to the legal issues, this court is compelled by the decision of the Court of Appeals in Matter of Roman Catholic Diocese v New York State Dept. of Health (66 NY2d 948) to reject the petitioner’s arguments that DEC used a criterion not found in the regulations, and did not properly promulgate *657 the contaminant standard in a regulation. In that case Upper Hudson Planned Parenthood applied to the Department of Health for permission to perform abortions in its clinics in the Cities of Albany and Hudson. The Department held a public hearing after which it approved the application. The petitioner commenced a CPLR article 78 proceeding contending that the determination was invalid because it was based in major part upon an unpublished Department policy that a public need for non-hospital-based abortion services exists whenever less than 50% of all abortion services are available on an out-of-hospital basis (the "50% rule”). The petitioner argued that since it did not know of the 50% rule it could not address that issue in objecting to the granting of the permit. This court ruled that the Department acted improperly in using the 50% rule to help decide the application when that rule was not published in a rule or regulation. The Appellate Division affirmed (109 AD2d 140, 148), but in a dissent Mr. Justice Levine stated: "Neither these decisions nor the State Constitution’s regulation-filing requirement (NY Const, art IV, § 8) were intended to overturn the general principle of administrative law that an agency is free to evolve standards, if consistent with the statutory framework, on a case-by-case basis and to apply them to the individual proceeding at hand. 'And the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency’ (Securities Commn. v Chenery Corp., 332 US 194, 203). The Supreme Court, in National Labor Relations Bd. v Bell Aerospace Co. (416 US 267, 294) and National Labor Relations Bd. v Wyman-Gordon Co. (394 US 765-766), expanded on its Chenery ruling in upholding an administrator’s right to formulate, announce and apply policy guidelines in the course of adjudicating individual cases without going through the Federal Administrative Procedure Act’s rule-making procedures (5 USC § 551 [4]; § 553) comparable to our State constitutional provision (see also, Davis, Administrative Law, at 186 [1982 Supp]). New York case law, up to now, has not been inconsistent with these general principles of administrative law in ruling that an administrative agency does not violate the regulation-filing requirement by 'establishing a guideline for a case-by-case analysis of the facts’ (Long Is. Coll. Hosp. v Whalen, 68 AD2d 274, 276, supra; see also, Matter of Organization to Assure Servs. for Exceptional Students v Ambach, 56 NY2d 518)”.
In reversing, the Court of Appeals (at 951) held: "On the *658 merits, however, we agree with Justice Howard A. Levine, the dissenter at the Appellate Division, that only a fixed, general principle to be applied by an administrative agency without regard to other facts and circumstances relevant to the regulatory scheme of the statute it administers constitutes a rule or regulation required by NY Constitution, article IV, § 8 to be filed in the office of the Department of State. We agree also, for the reasons stated by the dissenting Justice (109 AD2d, at p 148), that the 50% guideline employed by the Department of Health in passing on the applications involved in the present proceeding did not constitute and was not applied as such a rule”.
Here, the respondent determined the petitioner’s applications on a case-by-case basis and used its contaminant standard as one of the guidelines in deciding whether to grant or deny the applications. The contaminant standard was certainly not the only factor considered by the respondent in determining the individual petitions. Under the Roman Catholic Diocese case (supra) the respondent acted properly. The petitioner’s arguments that the respondent acted arbitrarily and capriciously by employing a standard not set forth in the regulations, and failing to promulgate that standard as a regulation are rejected.
The next issue is the petitioner’s argument that the determination should be annulled because the respondent failed to follow its own prior rulings. An administrative agency’s failure to follow its own prior rulings may constitute arbitrary and capricious conduct (Matter of Martin [Troy Publ. Co. — Roberts], 70 NY2d 679). However, it is equally true that "[a]n administrative agency is bound by prior determinations only where 'the existence of sufficient factual similarity’ between the two cases requires” (Matter of 590 W. End Assocs. v State Div. of Hous. & Community Renewal, 166 AD2d 184, 185). The Court of Appeals has stated that administrative agencies "are, therefore, free, like courts, to correct a prior erroneous interpretation of the law * * * by modifying or overruling a past decision” (Matter of Field Delivery Serv. [Roberts], 66 NY2d 516, 519). Upon this record, the respondent has established that the prior rulings relied upon by the petitioner were not of a similar factual nature, or arose early in the respondent’s implementation of the BUD program through a prior erroneous interpretation of the law.
The remaining contention is that the denials are arbitrary and capricious because the reuse of the materials would *659 not pose an environmental danger, and denying a BUD application because the contaminants in the material are not used in the manufacturing process or become a part of the product effectively eviscerates the BUD program. The applicable legal standards are set forth in Town of Hempstead v Flacke (82 AD2d 183, 187-188) as follows: "In reviewing the actions of an administrative agency, this court may only annul a determination if it is not rational — if it is arbitrary and capricious or unsupported by substantial evidence (see Matter of Pell v Board of Educ., 34 NY2d 222, 231). We may not substitute our judgment for that of the commissioner (see Matter of New York Water Serv. Corp. v Water Power & Control Comm. of Dept. of Conservation of State of N. Y., 257 App Div 590, 594, mod on other grounds 283 NY 23). The commissioner’s determination is entitled to great weight, especially where, as here, it is in an area requiring specialized, scientific knowledge (see Matter of La Valle v Berle, 68 AD2d 235, 240)”.
DEC’s determinations upon petitioner’s BUD requests may not be the same as this court would arrive at, but they are certainly not irrational. Moreover, they involve the specialized, scientific knowledge of DEC within its field of expertise. This court will not substitute its judgment for that of the respondent.