■ In the Matter of ENVIRONMENTAL DEFENSE FUND, INC., et al., Petitioners, v ROBERT F. FLACKE, as Commissioner of the New York State Department of Environmental Conservation, Respondent, and ORANGE AND ROCKLAND UTILITIES, INC., et al., Intervenors-Respondents. — Proceeding pursuant to CPLR article 78, to review a determination of the Commissioner of the New York State Department of Environmental Conservation, dated April 13, 1982, which, after a public hearing, approved the reconversion of units Nos. 4 and 5 of the Lovett Generating Plant to the burning of coal. Determination confirmed and proceeding dismissed on the merits, without costs or disbursements. Late in 1980 and early in 1981, Orange and Rockland Utilities, Inc. (hereinafter ORU), applied to the Department of Environmental Conservation (hereinafter DEC) for the permits needed to reconvert units Nos. 4 and 5 of its Lovett Generating Plant from oil- to coal-fired generation. ORU filed a draft environmental impact statement (hereinafter (DEIS) which was reviewed in public hearings. At the conclusion of these hearings, the administrative law judge compiled a hearing report, which, together with the DEIS, became the final environmental impact statement (hereinafter FEIS). In this proceeding, the Environmental Defense Fund (hereinafter EDF) contends that the FEIS does not comply with the mandates of the State Environmental Quality Review Act (ECL 8-0101 *et seq.,* hereinafter SEQRA) in a number of respects. In reviewing agency determinations on environmental matters, this court has held that the familiar standard of review for proceedings pursuant to CPLR article 78 is applicable. Thus, the court may only annul a determination if it is not rational, i.e., arbitrary and capricious, or unsupported by substantial evidence (*Town of Hempstead v Flacke,* 82 AD2d 183; see *Matter of Pell v Board of Educ.,* 34 NY2d 222). While we cannot substitute our judgment for that of the commissioner (*Town of Hempstead v Flacke, supra*), we must determine whether the entities involved have complied with the procedural requirements of SEQRA (see *Matter of Cohalan v Carey,* 88 AD2d 77). This court has noted that SEQRA requires literal compliance with its terms and substantial compliance will not suffice (*Matter of Rye Town/King Civic Assn. v Town of Rye,* 82 AD2d 474, apps dsmd 55 NY2d 747, mot for lv to app dsmd 56 NY2d 985). "Literal compliance is required because the Legislature has directed that the policies of the State and its political subdivisions shall be administered 'to the fullest extent possible' in accordance with SEQRA (ECL 8-0103, subd 6)" (*Glen Head-Glenwood Landing Civic Council v Town of Oyster Bay,* 88 AD2d 484, 490-491; *Matter of Rye Town/King Civic Assn. v Town of Rye, supra,*). "The test of SEQRA compliance is whether the approving agency has taken a 'hard look' at the relevant areas of environmental concern" (*Glen Head-Glenwood Landing Civic Council v Town of Oyster Bay, supra,* p 492; *Matter of Schenectady Chems. v Flacke,* 83 AD2d 460). We find that this test has been met in this matter. EDF's first challenge to the sufficiency of the FEIS is that it fails to consider the impact of increased sulfur dioxide emissions and acid deposition in the sensitive Hudson Highlands region. We note, however, that the FEIS contains a detailed analysis of this problem. By way of background, it should be noted that the witnesses for both EDF and ORU were in agreement that the deposition of sulfur compounds can occur through two mechanisms: (1) wet deposition, predominantly in the form of sulfate, in which sulfur is carried to the surface by precipitation (popularly known as acid rain) and (2) dry deposition, mostly in the form of sulfur dioxide ($SO_2$), which occurs through direct contact of gases and particles with the ground or vegetation. The DEIS

noted that the additional SO2 emissions from a reconverted plant burning 1.5% sulfur coal would increase the regional emissions by 0.9%. Using "worst case" modeling assumptions (which "in all likelihood" overstate expected impacts) ORU's consultants predicted an increase in sulfur deposition of 0.18% in EPA Region II (New York and New Jersey) and 0.10% in EPA Region I (New England). The sulfur deposition increase was considered "marginal" and its effects "uncertain". During the public hearings, ORU witness Thomas Lavery discussed the findings set forth above and noted that "sulfate deposition and the SO2 deposition that will be constituted by Lovett is basically negligible. So I can't say there will be a substantial increase * * * Let's put this all in perspective. This is a very minor source". The FEIS noted that "[t]he calculated effect [increases in sulfur emissions] is a decrease in the PH of precipitation of less than .01 PH units * * * based on the use of a model which attempts to simulate several atmospheric processes including transformation of sulfur dioxide to sulfate, the wet and dry deposition of both sulfur dioxide and sulfate, transport by wind and mixing by atmospheric turbulence". This change "would not be detectable by a normal laboratory pH meter." After documenting the rate at which sulfur dioxide is converted to sulfate, the FEIS stated that "[t]he maximum increase in sulfates from the Lovett plant would occur at a distance of about 100 to 150 kilometers (60 to 90 miles) from the plant * * * Most * * * of the sulfate would end up over the ocean." This extensive analysis satisfies the "hard look" requirement imposed by SEQRA (see *Glen Head-Glenwood Landing Civic Council v Town of Oyster Bay, supra,* p 492; ECL 8-0109, subd 2). EDF's witnesses Lipfert and Hendry presented testimony regarding the sensitivity of the nearby Hudson Highlands region to increased acidification as well as data predicting increases in the rate of the dry deposition of sulfur within a 30-kilometer radius of the Lovett units. ECL 8-0109 (subd 2) provides that an environmental impact statement "shall * * * include copies or a summary of the substantive comments received by the agency pursuant to subdivision four of this section". Subdivision 4 in turn notes that the purpose of the draft statement is, *inter alia,* to "solicit comments which will assist the agency in the decision making process". Construing SEQRA in light of the rule of reason (see *Matter of Town of Henrietta v Department of Environmental Conservation,* 76 AD2d 215), we do not interpret this section as requiring that the FEIS summarize and respond to the testimony of every witness presented at these hearings consuming over 7,000 pages of transcript. The FEIS, after extensive analysis, arrives at the conclusion that the impact of increased sulfur deposition would be minimal. As noted by the United States Court of Appeals, Ninth Circuit, "the [environmental impact] statement need not achieve scientific unanimity on the desirability of proceeding with the proposed action" (*Life of Land v Brinegar,* 485 F2d 460, 473). EDF additionally argues that the FEIS violated SEQRA by failing to address feasible alternatives. It alleges that the FEIS failed to consider EDF's proposal that the Lovett units burn 1.5 to 2.5% sulfur coal with "full" flue gas desulfurization (hereinafter FGD) scrubbing. Although this particular proposal was not analyzed, numerous alternatives were considered. The FEIS discussed and rejected such options as early plant retirement, new plant construction, and continued oil burning ("no action"). ORU's initial proposal to burn 1.5% sulfur coal without FGD equipment was also analyzed, as well as three alternatives set forth by that utility: (1) burning 5% sulfur coal with full FGD scrubbing, (2) burning 1.5% sulfur coal with "partial scrubbing", and (3) burning 0.75% sulfur coal with no FGD equipment. The FEIS rejected these proposals as they would not meet the applicable ambient air quality standards. Instead, the following options which would meet national ambient air quality standards were analyzed and approved: (1) utilization of 0.7% sulfur coal

without FGD, (2) burning 3.8% sulfur coal with 90% efficient FGD system and (3) burning 1% sulfur coal in one unit only, while monitoring the results to assure compliance with national ambient air quality standards. An environmental impact statement must include "a detailed statement setting forth * * * alternatives to the proposed action" (ECL 8-0109, subd 2, par [d]; see, also, 6 NYCRR 617.14 [b] [the environmental impact statement "should evaluate all reasonable alternatives"]; *Webster Assoc. v Town of Webster,* 59 NY2d 220; *Matter of Rye Town/King Civic Assn. v Town of Rye,* 82 AD2d 474, *supra*). This requirement was met by the discussion of the alternatives set forth above. All parties agreed that conversion to coal was a desirable option; the dispute centered upon the sulfur content of the coal to be used. Although EDF's proposal was not specifically discussed, the differences in sulfur content can be viewed as a continuum of possibilities. Thus, it was not necessary to discuss every conceivable possibility, especially where EDF's proposal was very similar to those actually analyzed. Again, the requirement that alternatives be considered must be construed in light of reason (see *Matter of Town of Henrietta v Department of Environmental Conservation of State of N. Y., supra; Commonwealth of Massachusetts v Andrus,* 594 F2d 872, 884; *Grazing Fields Farm v Goldschmidt,* 626 F2d 1068, 1074). An environmental impact statement must be "analytical" but "not encyclopedic" (6 NYCRR 617.14 [b]; see, also, *Vermont Yankee Nuclear Power Corp. v Natural Resources Defense Council,* 435 US 519). Thus the environmental impact statement properly limited its discussion to the numerous alternatives listed above. With respect to EDF's related contention that there was inadequate discussion of the acid impacts of each of the approved options, since the commissioner found that the burning of 1.5% sulfur coal without FGD would have no discernable acid impact and since EDF has conceded that the emissions increases under the approved options are less than those under the original proposal, an analysis of each of the lesser impacts from the approved options was unnecessary. EDF's other contentions have been examined and found to be lacking in merit. As the commissioner's determination is supported by substantial evidence and the procedural requirements of SEQRA have been adhered to, the commissioner's determination must be confirmed. Gibbons, J. P., Bracken, Brown and Niehoff, JJ., concur.