OPINION OF THE COURT
Thomas E. Mercure, J.
This action, a combined CPLR article 78 proceeding, action for declaratory judgment and taxpayers’ suit, challenges the propriety of the environmental review procedures employed in connection with consideration of a mass-burn resource recovery facility (hereafter referred to as the project or facility), proposed to be constructed and operated in the Village of Hudson Falls by defendant Adirondack Resource Recovery Associates (hereafter ARRA).
The defendants move for summary judgment dismissing the complaint. The plaintiffs cross-move for summary judgment annulling the approval of the FEIS, the execution of the waste disposal agreements by the defendant counties, and the approval and issuance of the subject bonds. Both plaintiffs and defendants assert that there are no factual issues involved in the action requiring a trial.
I. PROCEDURAL COMPLIANCE WITH SEQRA
A. Whether the determination of the Commissioner of DEC designating the Village of Hudson Falls lead agency for the generic EIS was arbitrary, capricious, an abuse of discretion and/or contrary to law.
In their petition and on the cross motion for summary judgment, plaintiffs contend that the selection of the Village of Hudson Falls as lead agency for the generic environmental impact statement (EIS) by the Commissioner of the Department of Environmental Conservation (DEC) violated ECL 8-0111 (6); 27-0703 and 6 NYCRR 617.6 (d) and (e).
*767 The major thrust of plaintiff’s argument is that each of the criteria set forth in 6 NYCRR 617.6 (d) (1) mitigated in favor of the designation of DEC Region 5 as lead agency. This argument has considerable merit and will be considered. However, a threshold issue, raised by the court and briefed by the parties at its request, shall first be addressed, i.e., whether the Village of Hudson Falls was jurisdictionally empowered to act as lead agency.
In Matter of Save the Pine Bush v Planning Bd. (96 AD2d 986, 988, appeal dismissed and Iv denied 61 NY2d 668), the Appellate Division, Third Department, held that a grant of lead agency status "to an entity not otherwise the decision-making entity is inconsistent with SEQRA for the simple reason that SEQRA’s 'mandate is to incorporate environmental concerns into the decision-making process of State and local agencies’ ” (citing Glen Head-Glenwood Landing Civic Council v Town of Oyster Bay, 88 AD2d 484, 492). Although we are not dealing here with the delegation of lead agency responsibilities by a decision-making agency to an agency lacking authority to make decisions, the holding is directly applicable to this case. Absent a decision-making role, an agency is not eligible for lead agency designation.
By letter dated November 23, 1984, Morris A. Nassivera, Mayor of the Village of Hudson Falls, sought the designation of the village as lead agency by the Commissioner of DEC. He stated, in the portion thereof devoted to the interest of the village in the project: "First, the Village is directly and intensively involved in many aspects of this Project. The Village Board made a commitment to the residents, voters and taxpayers of Hudson Falls when it granted an option to the developer that it would be directly involved in all stages of development of the Project, including the active request for designation as lead agency.[1] The Project site, which has been selected after careful evaluation of several proposals, is a parcel of land which is currently owned by the Village. Although the parcel is already zoned for heavy industrial use, the Village Board will likely have to take several steps to ensure full compliance with the Village Zoning Ordinance.[2] The $2.00 per ton payment in lieu of taxes which would inure *768 to the Village from the Project means that the economic interest of the Village in the Project amounts to approximately $350,000 per year, aside from the obvious benefit of enabling the Village to eliminate its solid waste disposal problem. The Village must arrange to deliver its refuse to the facility pursuant to local ordinance or contract and the Project will utilize Village services including water and sewer services and fire and police protection.”
Although many of the foregoing are reflective of the village’s enthusiasm for the project, and particularly its anticipated financial rewards, most fail to support its contention of entitlement to lead agency designation. As properly noted by the Mayor, it seems that the project was consistent with the village’s zoning ordinance, thereby precluding the necessity for the grant of a use permit or variance. Further, even if a variance was required, as is suggested in the EIS, application would be made to the Board of Zoning Appeals, an independent decision-making body, and not the Village Board. The argument of defendants that, should it appear that the present zoning does not permit the project, the Village Board may have to amend its zoning ordinance accordingly, is considered sufficiently speculative and remote as to obviate the need for consideration thereof. Similarly, that the village would utilize the completed project for waste disposal and would supply water and police and fire protection is irrelevant to its legal entitlement to act as lead agency. Assumedly, village water and police and fire protection are available to all taxpayers and residents thereof.
There is some merit, however, to the contention of the defendants that the village’s ownership of the project site is sufficient to confer standing. The act of an agency in selling or agreeing to sell realty has been held to constitute an "action” within the definition thereof (6 NYCRR 617.2 [b]) so as to trigger the SEQRA process (see, Devitt v Heimbach, 58 NY2d 925; Abrams v Love Canal Area Revitalization Agency, 132 Misc 2d 232), and it does appear that an agency’s consideration of a decision as to whether it should sell realty for a specific project would, under normal circumstances, suffice to support its designation as lead agency.
The issue is complicated, however, by the fact that on October 3, 1984, the village granted ARRA an irrevocable option to purchase the village-owned property constituting the project site. In so doing, it would first appear that the village removed itself from the decision-making process well in ad *769 vanee of its lead agency designation. However, a review of the option agreement finds qualifying language which would arguably suffice to permit the village’s exercise of discretion beyond its execution. Specifically, the option agreement provides, in paragraphs 5 and 6 thereof, that the period thereof is only six months and until April 1, 1985, with the right granted to the purchaser to renew for one additional period of six months. No provision is made for renewal beyond the expiration of one year following the date thereof. To the extent that it was altogether foreseeable that the required permits would not be issued during the period of the option[3] the village did retain the discretion to decline to extend the option beyond the stated extension and, as a result, power to effectively abort the project.
Paragraph 9 of the option agreement further conditioned exercise thereof upon "the Owner and the Purchaser entering into a satisfactory agreement as to payment in lieu of taxes to the Village of Hudson Falls, the host facility, for the Resource Recovery project, at an initial rate of $2.00 per ton.” No objective standards are furnished to assist in determining whether or not any proposed agreement would be "satisfactory”, so it could well be found that the village retained the power to decide whether to terminate the agreement.
Because of the court’s very limited power to set aside determinations of administrative agencies and because of the retention by the village of discretion to refuse to convey the realty, I am constrained to find for defendants on this threshold jurisdictional issue. The primary issue, whether the designation of the village was arbitrary and capricious, will now be addressed.
In my judgment, the project was of regional[4] and not local significance. Further, even if there was a basis for a finding that the anticipated impacts of the action were primarily of local significance, this finding would support the designation of the local agency under 6 NYCRR 617.6 (d) (1) (i) only if all other considerations were equal. The other considerations, set *770 forth at 6 NYCRR 617.6 (d) (1) (ii) and (iii), also mitigate against the designation of the village as lead agency. The superior position of DEC and particularly its Region 5 staff to perform the type of in-depth environmental assessment required to protect the citizens of the affected counties is obvious.
I cannot substitute my judgment for that of the Commissioner, however, or say that his determination is irrational and lacks support in the administrative record because his decision, after designating the village lead agency for the generic EIS, continues as follows: "Further, I am designating Region 5 as lead agency for any supplemental environmental impact statement that may be necessary at the design, detail, and permit review phase to assess site specific impacts associated with air quality, solid waste disposal, aesthetics, water quality, traffic and other relevant areas of concern that require further assessment to enable involved agencies to meet their SEQR responsibilities.”
Chief among such involved agencies is DEC, which must issue numerous permits to ARRA before the proposed facility can even be constructed. They include air pollution control permits; a permit to construct and a certificate to operate pursuant to ECL article 19; permits under ECL article 27, title 8 and 6 NYCRR part 360 to construct and operate the proposed solid waste management facility; a waste-water discharge permit under the State Pollution Discharge Elimination System (SPDES) program, pursuant to ECL article 17, title 8 and 6 NYCRR parts 750-757; and a permit ensuring protection of waters pursuant to ECL article 15, title 5 and 6 NYCRR part 608. Significantly, before issuing any permits, DEC is required to make an explicit finding that the requirements of SEQRA have been met, and it must determine that "consistent with social, economic and other essential considerations, to the maximum extent practicable, adverse environmental effects revealed in the environmental impact statement process will be minimized or avoided” (ECL 8-0109 [7], [8]; see also, 6 NYCRR 617.9 [c]).
The Commissioner’s determination to designate two lead agencies has resulted in both the village and DEC scrutinizing environmental impacts associated with the proposed facility, with the village focusing on generic issues such as site location and the basic technology to be applied in resource recovery, while DEC is reviewing site-specific environmental impacts. Although not specifically so stated, it is obvious that the *771 intent and actual effect of the dual designation was that DEC Region 5 have ultimate control over environmental review.[5] Its responsibility was to fill the void by addressing those areas of environmental concern which the village overlooked or inadequately considered. DEC Region 5 was, as already discussed in some detail, the appropriate lead agency. For that reason, I cannot find the over-all determination of the Commissioner to be arbitrary or capricious, to constitute an abuse of discretion or to be affected by error of law. Of course, in reviewing the Commissioner’s determination, the court may not overturn the determination merely because it may have reached a contrary conclusion; rather it may only consider whether the Commissioner’s determination finds support in the administrative record and is thus rational (see, Matter of Environmental Defense Fund v Flacke, 96 AD2d 862).
Moreover, even if the Commissioner’s designation of the village as lead agency is considered to be erroneous, the error is harmless because the village as lead agency made the correct determination of significance; required ARRA as applicant to go through all applicable SEQRA processes; gave all required notices; correctly accepted the DEIS and properly completed all of the responsibilities under SEQRA assigned to a lead agency.
B. Whether the village notified all involved agencies, as required by 6 NYCRR 617.6 (d) (1).
6 NYCRR 617.6 (d) (1) requires that in actions involving more than one agency, an agency seeking lead agency status must notify all involved agencies of its intention. Plaintiffs assert[6] that the Town of Moreau, the Adirondack Park Agency (APA) and the New York State Office of Parks, Recreation and Historic Preservation (OPRHP) were "involved” agencies because of the location of an alternate project site within the Town of Moreau; the fact that certain of the transfer station^ and ash dump site proposed in the DEIS are situate within the Adirondack Park and because of the requirement of PRHPL 14.09 that, prior to an action of approval or entitlement of any private project by a State agency, the agency’s *772 preservation officer give notice to and consult with the commissioner (OPRHP) concerning the impact of the project if it appears that any aspect of the project may or will cause any change, beneficial or adverse, in the quality of any historic, architectural, archeological, or cultural property that is listed on the national register of historic places or property listed on the State register or is determined to be eligible for listing on the State register by the commissioner.
Defendants respond that the fact that an alternate project site is situate within the Town of Moreau does not make it an "involved” agency, since it had no "power to fund, approve, or directly undertake” the project (6 NYCRR 617.2 [q]) as proposed, i.e., within the Village of Hudson Falls. Further, PRHPL 14.09 directs a State agency with permit power, in this case DEC, to consult with OPRHP, which it apparently has done. This has nothing to do with the lead agency designation. In addition, OPRHP is not an involved agency as it has no approval power — it can only make recommendations. Last, they argue that although the APA does have jurisdiction to approve the location of transfer stations and landfills situate within the park, for the purposes of the generic impact statement the project was not defined so as to include the specific location of transfer stations. Rather, each municipality within and without the park will deal with this issue locally and separately.
I agree with defendants and find that neither the Town of Moreau, OPRHP nor the Adirondack Park Agency were involved agencies within the definition of 6 NYCRR 617.2 (q) and that the village had no obligation to place them on notice.
C. Whether the lead agency violated 6 NYCRR 617.9 (a) in approving the project on December 20, 1984.
There is no question that the final environmental impact statement was not completed until a very short time (minutes, in fact) prior to the December 20, 1984 meeting of the Hudson Falls Village Board at which the document was accepted and approved. It is plaintiffs’ contention that 6 NYCRR 617.9 (a) prohibited the lead agency’s consideration of the FEIS and action in making and adopting written findings pursuant to 6 NYCRR 617.9 (c), accepting the FEIS and approving the project, prior to the expiration of 10 days following completion and filing of the FEIS. Defendants contend, however, that 6 *773 NYCRR 617.9 (a) was not violated since the lead agency did not make "a decision on an action which has been the subject of a final EIS” within the 10 days following the completion of the FEIS.
It is true that the village had no decisions to make during the period of the option agreement and that it could not, accordingly, make a "decision on an action” prior to expiration thereof. On December 20, 1984, the village merely accepted the FEIS so that other agencies could fulfill their own SEQRA duties. The 10-day requirement of 6 NYCRR 617.9 does not say that a lead agency must consider a FEIS for 10 days before accepting it. To so hold would not make any sense. Accordingly, plaintiffs’ contention is rejected.
II. SUBSTANTIVE COMPLIANCE WITH SEQRA
A. Whether the lead agency adequately considered the final EIS prior to making the December 20, 1984 decision to accept it.
It is the position of the plaintiffs that the Village of Hudson Falls did not adequately consider the final EIS prior to its acceptance. As evidence they point out that the FEIS was completed and available for consideration for a matter of only minutes prior to its acceptance; that the village’s expert had only one day to consider the lengthy comments received on December 19 and that the rush to sell the bonds on or before December 31 forced the village to give "short shrift” to consideration of the environmental impacts discussed in the FEIS. Although plaintiffs contend that a defect was created in the SEQRA process because of the short period of review, they do not point out how or why that review was substantively deficient. There is no allegation that the responses to the comments were inadequate, that the review was not thorough or that the time periods involved were not adequate to perform the necessary tasks. The only conclusion to be drawn is that although time constraints existed, the review was adequate.
As a matter of policy, the court’s inquiry on this issue cannot go beyond the question of whether the completed FEIS was available to the lead agency at the time it made its determination to accept it. Contrary to plaintiffs’ assertions, there is no legitimate factual issue here. The FEIS was delivered at approximately 1:30 p.m. on December 20, 1984.
A review of a great many, if not all, of the decisions of New *774 York appellate courts concerning the "hard look” standard first enunciated (in New York) in H.O.M.E.S. v New York State Urban Dev. Corp. (69 AD2d 222) finds not one that analyzed the thought process or questioned the expertise of the lead agency or the amount of time it took to conduct its consideration. In each case, rather, it was the FEIS, and its content and its adequacy which was considered. This is as it should be. As stated by Judge Fuld in Matter of Taub v Pirnie (3 NY2d 188, 193-194): "Courts, we have said, will not' "probe the mental processes’ ” of the members of an administrative tribunal * * * Absent a showing, 'clearly reveal[ed],’ that 'they made no independent appraisal and reached no independent conclusion’ * * * we will not disturb the decision. As we wrote in the Weekes case [Matter of Weekes v O’Connell, 304 NY 259], 'the extent to which independent study of the evidence in the record is necessary to the required exercise of informed judgment must be left to the wisdom and practical good sense of the commissioners themselves’ (304 N. Y. 259, 265). It is enough if the administrators seek to make and have the means to make an informed decision, one that is based on knowledge sufficient for 'wise and proper judgment.’ ”
Viewed in this light, the court is constrained to find that plaintiffs have failed to meet their burden.
B. Whether the final EIS adequately addresses the relevant areas of environmental concern.
Consistent with long-standing principles of administrative law, the court’s role in determining the adequacy of the FEIS and the lead agency’s substantive compliance with SEQRA is extremely limited. As stated in Matter of Jackson v New York State Urban Dev. Corp. (67 NY2d 400, 417): "Our inquiry is tempered in two respects. First, an agency’s substantive obligations under SEQRA must be viewed in light of a rule of reason. 'Not every conceivable environmental impact, mitigating measure or alternative must be identified and addressed before a FEIS will satisfy the substantive requirements of SEQRA’ (Aldrich v Pattison, 107 AD2d 258, 266, supra; Coalition Against Lincoln W. v City of New York, 94 AD2d 483, 491, affd 60 NY2d 805, supra). The degree of detail with which each factor must be discussed obviously will vary with the circumstances and nature of the proposal (see, Webster Assoc. v Town of Webster, 59 NY2d 220, 228). Second, the Legislature in SEQRA has left the agencies with considerable latitude in *775 evaluating environmental effects and choosing among alternatives (see, e.g., ECL 8-0109 [8]). Nothing in the law requires an agency to reach a particular result on any issue, or permits the courts to second-guess the agency’s choice, which can be annulled only if arbitrary, capricious or unsupported by substantial evidence (Aldrich v Pattison, 107 AD2d 258, 267, supra; see also, Vermont Yankee Nuclear Power Corp. v Natural Resources Defense Council, 435 US 519, 555).”
In addition, application of the doctrine of exhausting of administrative remedies requires the court to limit its consideration to specific objections to the EIS which were voiced during the SEQRA process and prior to acceptance of the FEIS (see, Aldrich v Pattison, supra, at 267-268). Significantly, the effect is that the court is not empowered to consider the affidavit of Theodore D. Goldfarb, annexed to plaintiffs’ moving papers as exhibit "P”.
This being the case, the court’s inquiry is limited to the actual comments addressed to the DEIS. A review of the comments and the responses thereto contained in the FEIS discloses that all significant environmental concerns raised in the comments were addressed in the responses. Although the scientific validity of the responses may be subject to some question, the fact is that unanimity of scientific opinion is not a prerequisite to a valid FEIS. The FEIS is to be "analytical not encyclopedic” (6 NYCRR 617.14 [b]) and differences in scientific opinion and conclusions are not sufficient to make a FEIS deficient (Matter of Environmental Defense Fund v Flacke, supra). There is simply not a sufficient factual basis for a determination that the FEIS is substantively inadequate, an issue upon which plaintiffs bear the burden of proof.
C. Whether the requirement that the EIS refer to the State solid waste management plan was violated by virtue of the fact that said plan has not been created.
ECL 27-0707 provides in pertinent part as follows:
"1. On and after the effective date of the initial rules and regulations of the department promulgated pursuant to subdivision one of section 27-0703, no person shall commence operation, including site preparation and construction, of a new solid waste management facility until such person has obtained a permit pursuant to this title.
"2. The rules and regulations adopted by the department to *776 implement this article and the provisions of article 70 of this chapter and rules and regulations adopted thereunder shall govern permit applications, renewals, modifications, suspensions and revocations under this article. The administration of such permit applications shall be in accordance with article 8 of this chapter [SEQRA]. The rules and regulations adopted by the department to implement this article shall specify, at a minimum * * *
"(b) in the case of a permit application for which an environmental impact statement pursuant to article 8 of this chapter must be prepared, that such statement shall include a description and evaluation of the status of the proposed activity in light of the New York state solid waste management plan in effect on the date of the application” (emphasis supplied).
It is undisputed that, although the preceding sections were effective on June 26, 1980, the New York State solid waste management plan has never been implemented as provided for in ECL 27-0103 (1). It is plaintiffs’ contention that this omission has the effect of prohibiting: (1) the approval of a FEIS prepared in connection with any new solid waste management facility, as the requirements of ECL 27-0707 (2) (b) and/or regulations adopted in conformity therewith cannot be complied with, and, as a consequence thereof, (2) the issuance of any permits to construct new solid waste disposal facilities. Defendants, on the other hand, argue that the obvious purpose for the final words of that section, emphasized above, is to prevent a moratorium on new solid waste facilities pending implementation of the initial State solid waste management plan. That is, a FEIS need only consider the plan then in effect, and if none is in effect this requirement does not apply. Evidence of this intention is found, they assert, in the fact that there was no plan in effect at the time of enactment of the legislation.
There is considerable merit to plaintiffs’ contentions. Initially, if the emphasized language was intended to compensate for the fact that there was no State-wide plan in effect at the time of enactment of the legislation, it must be presumed that the Legislature would have simply provided that the requirements of ECL 27-0707 (2) (b) be effective on the date of implementation of the initial State-wide plan. In fact, the preceding subdivision (ECL 27-0707 [1]) commences with the language: "On and after the effective date of the initial rules and regulations of the department”, thereby tending to estab *777 lish the ability of the Legislature to unequivocally defer application of a statutory requirement when it so intends.
Additionally, the existence of the emphasized language is entirely consistent with the provision of ECL 27-0703 (2) that the plan be modified annually. If the State-wide plan is dynamic in nature, as it is clearly intended to be, it would be important to fix an effective date in ECL 27-0707 (2) (b) and regulations to be promulgated thereunder so as to prevent the need to modify an EIS during the SEQRA process to adapt to changes in the plan taking place after the commencement of the permit process. As is the case, the date of permit application would be the most sensible effective date. Further support for plaintiffs’ interpretation is found in Laws of 1980 (ch 552, § 1), the legislation embodying all of the foregoing provisions of the ECL article 27, which provides in pertinent part as follows: "b. In chapter four hundred twenty-five of the laws of nineteen hundred seventy-seven, constituting the New York state resource recovery policy act, the state department of environmental. conservation (hereinafter referred to as the 'department’) was given responsibility to, and did, develop and file with the legislature a completed draft of the New York state comprehensive resource recovery plan. It is the purpose of this act to carry forward and achieve the intent of the New York state resource recovery policy act” (emphasis supplied).
Obviously, the Legislature’s understanding at the time was that the initial State-wide plan was complete and ready for implementation. As such, it could be argued that the Legislature had no logical reason to consider or provide for the possibility that an extended period of time (now in excess of six years) would pass prior to implementation of the plan.[7] At the same time, under the 1977 act (L 1977, ch 425), and particularly section 7 thereof, a timetable was created under which ultimate implementation of the State-wide plan would follow the filing of the initial draft by no more than six months. This timetable was omitted from the current act. Its deletion would seem to constitute, strong evidence of the Legislature’s intention that no time limitation apply and, consequently, support for defendants’ moratorium prevention theory.
Defendants further argue that this court should give great *778 deference to the interpretation given ECL article 27 by the Commissioner of DEC, since the interpretation given a statute by the agency charged with its enforcement will be respected by the courts if not irrational or unreasonable (see, Matter of Fineway Supermarkets v State Liq. Auth., 48 NY2d 464). This is correct, although I must question the appropriate weight to be given the Commissioner’s interpretation when he is accused of purposeful dereliction of an unequivocal legislative direction.
The failure of the Commissioner of DEC to formulate a comprehensive State-wide solid waste plan is grievous, particularly in light of the pressure that he has placed upon municipalities to construct mass-burn facilities, assumedly in the absence of a detailed consideration of alternate technologies, recycling techniques and regional impacts which a comprehensive plan would address. At the same time, the subject statutory provision is not sufficiently clear to mandate a finding of its violation. In a case, such as this, where a statute is subject to differing interpretations, a court, particularly a court of first instance, is required to avoid an interpretation which will occasion great inconvenience or produce inequality, injustice or absurdity (see, Zappone v Home Ins. Co., 55 NY2d 131).
Accordingly, the court rejects plaintiffs’ legal claims, although with some reluctance.
III. WHETHER THE AGREEMENTS BETWEEN COUNTIES, THE IDA AND ARRA VIOLATED NEW YORK CONSTITUTION ARTICLE VIII AND GENERAL MUNICIPAL LAW § 870.
General Municipal Law § 870, applicable to issuance of bonds and notes by an industrial development agency, provides as follows: "The bonds or notes and other obligations of the authority shall not be a debt of the state or of the municipality, and neither the state nor the municipality shall be liable thereon, nor shall they be payable out of any funds other than those of the agency.”
Plaintiffs contend that the waste disposal contracts entered into by the defendant counties and particularly the formula for computing tipping fees makes the counties directly responsible for payment of the bonds and interest thereon (as well as the balance of the expenses attributable to construction and operation of the facility). As a practical matter, this is abso *779 lutely correct. However, the Court of Appeals has approved practically identical financing arrangements in Wein v City of New York (36 NY2d 610), Robertson v Zimmerman (268 NY 52) and Comereski v City of Elmira (308 NY 248). I am bound by those determinations.
For the reasons stated herein, the motion for summary judgment is granted and the cross motion is denied. The complaint-petition is dismissed. The attorney for defendant ARRA is requested to submit an order consistent herewith with notice of settlement. Because of the fact that the within motion and cross motion required determination of novel legal issues upon which reasonable minds could easily disagree and the fact that public funds shall be utilized in construction of the subject facility, the plaintiffs are granted a stay for a period of 60 days following entry of the order hereon, enjoining site preparation, construction or other action in pursuance of construction of the facility as completely as if permits therefor had not been issued. During the period of the stay, plaintiffs may file a notice of appeal and make application to the Appellate Division for stay pending appeal. In the absence of timely application for continuation of the temporary stay herein, it shall automatically expire.

. No support is found in the record for this contention. If such a commitment was in fact made prior to the grant of the option, it was not reflected in the minutes of any meeting of the Board supplied to the court.

. These steps have never been identified.

. In fact, the permits were not issued within two years thereafter.

. The emissions generated by the facility will not observe the village boundaries; the substantial traffic of large refuse hauling vehicles generated by the project cannot reach the facility from a three-county area without traversing neighboring communities. Similarly, the financial impact of the project through tipping fees for waste disposal is to be borne by the residents of three entire counties and, possibly, portions of northern Sara-toga County as well.

. More than adequate support for this conclusion can be found in the February 14, 1986 interim decision, the August 8, 1986 second interim decision and the October 31, 1986 decision of DEC Commissioner Williams, issued in connection with application for and approval of DEC permits and the SEQRA process attendant thereto.

. As limited by their cross motion for summary judgment.

. Actually, the Commissioner was directed to develop the State-wide plan in the 1977 act, so the direction has gone unheeded for in excess of nine years in all.