OPINION OF THE COURT
Robert S. Rose, J.
On January 4, 1989, respondent adopted a resolution authorizing the filing of a findings statement pursuant to the New York State Environmental Quality Review Act (SEQRA) (ECL art 8) for a proposed landfill site located in the Town of Dryden and authorizing the filing of an application to construct and operate a sanitary landfill. This resolution was the culmination of a multiphase landfill siting study begun in *875 1986. Of the 23 potential landfill sites identified and evaluated during Phase I, 9 were field tested, and 3 of the 9 tested sites were recommended for further consideration at the conclusion of Phase II. On December 7, 1987, respondent chose 1 of those 3 sites, known as DR-7, as the preferred site for development. During the first half of 1988, extensive hydrogeologic investí-, gation of site DR-7 constituted Phase III. Subsequently, draft and final environmental impact statements (EIS) for development of site DR-7 were completed, respectively, in August and December of 1988. The landfill to be constructed and operated at site DR-7 is part of a comprehensive solid waste management program undertaken by respondent to provide for the disposal of solid waste following the closure of the Landstrom Landfill.
Petitioners commenced this CPLR article 78 proceeding to obtain an order annulling respondent’s determination and enjoining the submission of an application for a permit to construct and operate the landfill on site DR-7. Although petitioners question the suitability of site DR-7, their primary contention is that respondent failed to comply with the requirements of SEQRA by limiting further investigation of the 23 potential sites, identified in Phase I of the siting study, to only the nine sites to which access for testing had been voluntarily granted by the landowners. Petitioners assert that respondents told the public that each of the 23 potential sites would be investigated by field testing and that respondent’s failure to exercise its power to gain access to all sites, conferred by EDPL 404, unreasonably excluded 5 of the 10 sites having the highest preliminary ratings for suitability as landfills. Petitioners argue that SEQRA’s mandate to evaluate "the range of reasonable alternatives” (6 NYCRR 617.14 [f] [5]; see also, ECL 8-0109 [2] [d]) is a procedural, rather than a substantive, requirement with which respondent must strictly comply by testing every potential site.
Respondent denies that it promised to test every potential site and asserts that the applicable regulations did not require "forced entry” for testing because a sufficient number of sites, or key parcels within those sites, had been made available voluntarily. Respondent argues that the decision to conduct field tests on only the nine sites to which it had access without recourse to its condemnation powers had a reasonable basis in respondent’s desire to minimize the expense of the testing and to avoid antagonizing reluctant owners. Respondent also asserts that it complied literally with SEQRA procedures by *876 designating itself as the lead agency, determining the project to be a Type 1 action under SEQRA, filing a positive declaration, conducting site studies, holding appropriate public hearings, and preparing both the draft and the final environmental impact statements. Respondent’s primary argument is that the evaluation of alternative sites is a substantive, rather than a procedural, requirement of SEQRA and that its site-selection decisions, including the decision to test 9 of the 16 top rated sites, met the test of reasonableness used to measure compliance with the substantive requirements of SEQRA.
The essential issue presented by the petition is whether or not SEQRA, or any applicable regulation, required respondent to conduct field testing on all of the potential sites that were ranked high in the Phase I study’s numerical rating of preliminary landfill suitability.
It is not disputed that 7 of the 16 highest rated sites were not tested or that any of those 7 sites could have been tested and subsequently acquired despite owner opposition through the use of respondent’s condemnation powers. The record indicates the following pertinent facts: (1) respondent decided that a minimum of 6 of the 23 sites ranked in the Phase I study should be subjected to further investigation (Resolution No. 89, Mar. 19, 1987); (2) the Solid Waste Management Committee (Committee) agreed to seek rights of entry from 15 of the top 16 ranked sites; (3) the Committee considered obtaining court permission to enter sites to which owners refused access (schedule of events, Solid Waste Management Committee, Mar. 4, 1987; meeting summary, Solid Waste Management Committee, July 9, 1987); (4) by July of 1987, 8 of the 23 sites had been subjected to preliminary testing with the permission of the owners of key parcels within each site (resolution, Solid Waste Management Committee, July 22, 1987); (5) the Committee initially chose not to test the remaining sites because of the expense involved (resolution, Solid Waste Management Committee, July 22, 1987); (6) in addition, respondent declined to exercise the right of entry authorized by EDPL 404 in order to avoid unnecessary confrontations with objecting property owners and potential court proceedings; (7) a ninth site was voluntarily made available and tested; (8) respondent chose site DR-7 as the preferred site (Resolution No. 334, Dec. 7, 1987); (9) during further investigation, the section 404 right of entry was exercised to test one inaccessible parcel within site DR-7.
In order to apply the appropriate standard of judicial review *877 to respondent’s actions, the court must first determine whether the requirement that all environmental impact statements (EIS) contain a detailed statement of the "alternatives to the proposed action” (ECL 8-0109 [2] [d]) is a procedural or a substantive requirement of SEQRA. More specifically, the corresponding SEQRA regulations require that all draft EIS contain "a description and evaluation of the range of reasonable alternatives * * * including] * * * as appropriate, alternative * * * sites” (6 NYCRR 617.14 [f] [5]). If this requirement is an environmental review procedure then compliance must be literal (Aldrich v Pattison, 107 AD2d 258, 264). If this requirement concerns the substantive content of an EIS, then compliance "is to be construed in light of the rule of reason” (Aldrich v Pattison, supra, at 266).
SEQRA and its implementing regulations provide a procedural framework for the inclusion of substantive environmental factors in the planning, public review, and decision-making for projects that may have adverse environmental consequences. However, the procedures describing when certain actions must be taken and what notice must be given have been distinguished from the substantive environmental information that must be considered and included in the EIS by the project sponsor (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 415-416). Procedural requirements mandate the designation of a lead agency, the determination of the need for an EIS, and the preparation, circulation, and solicitation of public comment on both a draft and a final EIS (Matter of Jackson v New York State Urban Dev. Corp., supra, at 415). These requirements are very detailed with specified time periods, notices, and public hearings (see, 6 NYCRR 617.8).
In contrast, the substantive requirements of SEQRA provide only general guidelines for the content of the EIS itself (Aldrich v Pattison, supra, at 265). The regulations list general categories of information, including alternatives to the proposed action, that must be included and analyzed (see, 6 NYCRR 617.14 [f]). The requirement to describe and evaluate reasonable alternatives contained in 6 NYCRR 617.14 (f) (5) is included with other categories of information to be included in the EIS and has been subjected to the "rule of reason” standard of judicial review (Horn v International Business Machs. Corp., 110 AD2d 87, 95) because it is a substantive, rather than a procedural, requirement (Aldrich v Pattison, supra, at 265-266). Moreover, petitioners have presented no *878 authority for their conclusory allegation that the gathering of information on alternative sites "clearly falls within the scope of procedure”. Therefore, the court finds that the consideration of alternatives is a substantive requirement that must be construed in light of reason (see, Matter of Environmental Defense Fund v Flacke, 96 AD2d 862, 864), and that petitioners have not met their burden of establishing that respondent failed to literally comply with the procedural requirements of SEQRA.
Since the SEQRA "alternatives” requirement is substantive, respondent’s compliance is subject to the more flexible "rule of reason” or "hard look” standard of judicial review. Under this standard, not every conceivable alternative must be considered to satisfy the substantive requirements of SEQRA and agencies have considerable latitude in choosing among alternatives (Aldrich v Pattison, supra, at 266). "Nothing in the law requires an agency to reach a particular result on any issue, or permits the courts to second-guess the agency’s choice, which can be annulled only if arbitrary, capricious or unsupported by substantial evidence” (Matter of Jackson v New York State Urban Dev. Corp., supra, at 417).
Therefore, in evaluating reasonable alternative sites for the landfill, respondent was obligated to take a "hard look” at the relevant areas of environmental concern and make a "reasoned judgment” (Horn v International Business Machs. Corp., supra, at 93). Respondent was required to consider a reasonable range of feasible alternative sites rather than to investigate every conceivable possibility. Here, the crucial issue in applying this standard is whether the range of sites considered by respondent after the completion of Phase I was reasonably restricted to 9 of the 16 top rated sites based upon the nonenvironmental factor of voluntarily permitted access.
With regard to petitioners’ argument that respondent breached its promise to test all potential sites, the court finds no evidence in the record indicating that such a promise was made. As was stated in the first progress report of the Solid Waste Management Committee, and confirmed in subsequent reports, the plan was to identify and rate potential sites and then "[a] limited number of sites having the highest scores will be recommended for further detailed investigations” (Solid Waste Management Program, Progress Report No. 1, at 2). Thus, rather than impose a duty to test all sites upon itself, respondent promised and planned to test only a limited number of potential sites.
*879 With regard to the evaluation of alternative sites, it is clear that SEQRA contemplates the consideration of nonenvironmental factors, especially in choosing among alternatives with comparable environmental qualities (see, e.g., Aldrich v Pattison, supra, at 275). SEQRA requires agencies to consider "alternatives which, consistent with social, economic and other essential considerations, to the maximum extent practicable, minimize or avoid adverse environmental effects” (ECL 8-0109 [1]).
Here, the 23 sites identified in Phase I of the site selection study were ranked according to suitability factors dealing with physical characteristics, environmental impact, and economic feasibility. One of the economic feasibility factors was "Accessible Ownership” which considered both the number of owners with which respondents would have to negotiate in order to secure the land and the present land use of the affected parcels. This factor was included because potential sites existed on properties other than those which had been offered by their owners for use as a landfill (report, Solid Waste Management Program, Phase I, Landfill Siting Study, at 31 [Feb. 1987]). This factor was consistent with respondent’s previously announced plan to consider those properties offered by their owners in selecting specific parcels to be ranked in Phase I of the study (Solid Waste Management Program, Progress Report No. 1, at 2 [1986]). Thus, the inclusion of this factor in Phase I indicated that respondent was going to consider sites that were more readily available as well as evaluate the difficulty of acquiring less available sites.
It is clear that the factors applied in Phase I incorporated the relevant environmental issues as well as respondent’s legitimate economic and social concerns involved in obtaining parcels from objecting owners. Although the revised solid waste management regulations (6 NYCRR part 360 [eff Dec. 31, 1988]) were not in effect in 1986 when the factors to be used in the Phase I study were selected, those factors included substantially all of the criteria mandated by the new regulations for site selection (6 NYCRR 360-2.12 [d]) and for environmental suitability (6 NYCRR 360-2.12 [e]). Thus, the record amply supports the conclusion that respondent identified and considered the relevant social, economic, and environmental factors in ranking the preliminary suitability of all 23 sites. Moreover, the early inclusion of nonenvironmental factors in the ranking process evidenced an ongoing concern with the practical difficulties of developing less available sites rather *880 than a sudden abandonment of environmental factors in favor of nonenvironmental ones.
Since respondent could reasonably consider nonenvironmental factors in selecting a site, the next issue is whether the weight given to the nonenvironmental factor of site availability became unreasonable when it resulted in the elimination of seven of the top ranked sites from further investigation. On this issue, petitioner cites the SEQRA regulation (6 NYCRR 617.14 [f] [5]) and two cases, Horn v International Business Machs. Corp. (supra) and Webster Assocs. v Town of Webster (112 Misc 2d 396, affd 85 AD2d 882, revd on other grounds 59 NY2d 220), which recognize a double standard for assessing the adequacy of an applicant’s discussion of alternatives. Unlike governmental agencies, private developers may limit their consideration of alternate sites to parcels owned or under option to them because they do not have the resources and eminent domain power possessed by a governmental agency (see, Webster Assocs. v Town of Webster, supra, 112 Misc 2d, at 410). From these authorities, petitioners infer that respondent was required to investigate every alternative site because every site was available to it through the use of the power of eminent domain.
The authorities cited by petitioners narrow the range of alternatives for private developers, but they do not purport to broaden "the range of reasonable alternatives to the action which are feasible, considering the objectives and capabilities of the project sponsor” (6 NYCRR 617.14 [f] [5]). On the one hand, a governmental agency cannot put itself in the position of a private developer and consider only 1 or 2 readily available sites. On the other hand, it does not have to investigate every alternative as long as numerous alternatives are considered (see, Matter of Environmental Defense Fund v Flacke, supra, at 863-864). Between the two extremes, reasonableness, rather than the number of sites, is the determinative factor. Here, respondent tested a majority of the 16 top ranked sites, including 2 of 3 highest ranked sites. The record indicates that the preliminary suitability of nine tested sites was very similar to that of the untested ones (report, Solid Waste Management Program, Phase I, Appendix C). Thus, those nine sites presented a reasonably broad range of alternatives (see, Matter of Environmental Defense Fund v Flacke, supra, at 864), if respondent was not compelled to use its condemnation powers.
Although respondent had the power to test or acquire any *881 site it chose, the exercise of that power was not without its limits and costs. "In appropriating lands for public purposes, there is a duty to take no more land and do no greater damage than is necessary for the public use intended” (County of Onondaga v Sargent, 92 AD2d 743). While site selection is properly a matter for the condemning authority rather than the court, both judicial review and social pressures require a public agency to strike a rational balance between public need and private property rights (see, Matter of Neptune Assocs. v Consolidated Edison Co., 125 AD2d 473, 475). Although respondent was required to choose a site that would minimize or avoid adverse environmental effects to the maximum extent practicable consistent with social, economic and other essential considerations (ECL 8-0109 [8]), unnecessary use of the condemnation power would be avoided if a satisfactory landfill could be developed with minimal adverse environmental impact at a readily available site. Moreover, the difficulty, expense, and resulting delay involved in prosecuting a condemnation proceeding opposed by a persistent landowner are substantial impediments to bringing an urgent public project to fruition. Thus, the benefits of avoiding the economic and social consequences of such a taking provide the requisite reasonable basis for respondent’s decision to use its condemnation power only if voluntary access failed to yield a suitable site.
In support of their argument that respondent could not hold its condemnation power in reserve, petitioners refer to clause (iv) of section 360-2.12 (a) (2) of the new regulations for solid waste management facilities (6 NYCRR part 360). Clause (iv) states: "Preliminary field investigations must be conducted at the highest ranking available site or sites, to identify any major obstacles to site development, and to provide sufficient data to differentiate among the preferred sites and support a siting decision.” Since this regulation was not in effect when respondent conducted its site selection studies, and since there is no authority suggesting that this standard should be applied retroactively, the court need not decide whether respondent complied with this requirement.
However, rather than assume compliance with the regulations, respondent affirmatively sought and obtained confirmation from the Department of Environmental Conservation (DEC) that it had tested a sufficient number of potential sites. In November of 1987, respondents, through their attorney, wrote to the DEC regional attorney, Richard J. Brickwedde, *882 soliciting a written comment confirming that respondent was not required to use its power to test under EDPL 404 because 9 of the top 16 sites had been tested. In his responsive letter of November 27, 1987, Mr. Brickwedde stated: "It is acceptable in a given case to make a determination of social and economic grounds that where a sufficient number of sites were voluntarily made available for more extensive testing, to limit the extensive study to those sites without requiring an agency to seek court orders to examine further sites over the objection of the landowners.” While this statement alone does not decide the issue, it indicates that respondent sought to comply with applicable regulations regarding the range of sites to be tested and that DEC did not interpret the applicable regulations to require testing of all top ranked sites.
Therefore, the court concludes that respondent was not required to use its condemnation power to test potential sites and that its decision not to exercise that power had a rational basis in its concern with social and economic factors. Respondent identified and analyzed the relevant areas of environmental concern in selecting a site for the landfill, including the potential suitability of a sufficiently broad range of alternative sites. Respondent also evaluated the alternative sites in an appropriate degree of detail considering the nature of the project and the variety of environmental and nonenvironmental factors affecting site suitability. That evaluation readily permitted a comparative assessment of the alternatives and provided a rational basis for respondents’ choice. This investigation and analysis complied with the substantivé requirements of SEQRA because it passed the "hard look” test and constituted a "reasoned elaboration” for the choice of site DR-7.
Accordingly, the petition is denied.