In the Matter of FANNIE MAE JACKSON et al., Respondents-Appellants, v NEW YORK STATE URBAN DEVELOPMENT CORPORATION et al., Appellants-Respondents.

In the Matter of IMRE J. ROSENTHAL et al., Respondents-Appellants, v NEW YORK STATE URBAN DEVELOPMENT CORPORATION, Appellant-Respondent.

First Department, October 22, 1985

**APPEARANCES OF COUNSEL**

*Stephen L. Kass, Stephen J. Ritchin* and *Carol A. Buckler* of counsel (*Berle, Kass & Case,* attorneys), for appellants-respondents.

*Wayne G. Hawley* of counsel (*Jonathan A. Weiss* and *Norman Siegel* with him on the brief, attorneys), for Fannie Mae Jackson and another, respondents-appellants.

*Norman Dorsen* and *LeBoeuf, Lamb, Leiby & MacRae* for Imre J. Rosenthal and another, respondents-appellants.

*Warshaw Burstein Cohen Schlesinger & Kuh* for Leonard Clark, respondent-appellant.

*Lankenau, Kovner & Bickford* for Stephen F. Wilder and others, respondents-appellants.

### OPINION OF THE COURT

CARRO, J.

These are cross appeals from a judgment (denominated an order and judgment) of the Supreme Court, New York County (Robert E. White, J.), entered July 12, 1985, in two consolidated CPLR article 78 proceedings, which determined the extent of respondent-appellant New York State Urban Development Corporation's (UDC) compliance with relevant statutes in analyzing the environmental impact of its proposed 42nd Street Development Project (the Project). Respondent-appellant UDC appeals from so much of the judgment as held that the UDC was arbitrary and capricious in approving the Project without specifically considering its potential impact on the New York City Water Tunnel No. 1 (water tunnel) and in not submitting to public scrutiny various changes in the building plan of the hotel portion of the Project. It also appeals from so much of the judgment as vacated UDC's approval of the Project, remanded the matter to UDC with directions to prepare an amended environmental impact statement assessing the Project's impact on the water tunnel, enjoined UDC from proceeding with the Project until such was completed, and enjoined UDC from making any changes in the Project without first submitting such changes to public scrutiny.

Petitioners-cross-appellants Rosenthal *et al.* appeal from so much of the judgment as dismissed their challenges to the UDC's analysis of the Project's impact on traffic, air quality and archaeological sites and their claims of certain procedural defects in UDC's environmental review of the Project's impact. Petitioners-cross-appellants Fannie Mae Jackson and Larry F. Flower appeal from so much of the judgment as dismissed in its entirety their petition, which sought to compel UDC to adopt more effective measures to mitigate the impact the Project will have an increased gentrification in the Clinton neighborhood and to conduct a specific study of the Project's impact on Clinton's elderly citizens.

Before addressing the merits of these various claims it is appropriate to provide some background information on the relevant statutes in this case. In 1968, the New York State Urban Development Corporation Act (UDCA) was enacted for

the express purposes of promoting a vigorous and growing economy, ameliorating blighted and deteriorating areas throughout the State, and supplying adequate and safe dwelling accommodations for families of low income. (McKinney's Uncons Laws of NY § 6251 *et seq.;* L 1968, ch 174, § 1.) Toward this end a corporate governmental agency, the UDC, was created and endowed with broad powers to plan and implement projects which will achieve these goals. In cooperation with the City of New York, a project was planned to rehabilitate and develop approximately 13 acres of blighted, crime-ridden, and underdeveloped land on West 42nd Street near Times Square. The Project proposes to replace the area's present structures with four high-rise office towers, a hotel and a wholesale merchandise mart, to renovate eight theaters and to modernize the Times Square subway station. The Project's aim is to eliminate the blight, crime and decay that have so long marked the area and to restore the area as an entertainment and commercial center, thus increasing the area's economic contribution to the city.

In undertaking this project UDC was required to comply not only with the UDCA but also with the New York State Historic Preservation Act of 1980 (SHPA) (PRHPL art 14), the New York State Eminent Domain Procedure Law (EDPL) and, most importantly, the State Environmental Quality Review Act (SEQRA) (ECL 8-0101 *et seq.*). SEQRA and its implementing regulations delineate procedures whereby the agency proposing a project incorporates into its planning, review and decision-making process the consideration of the project's environmental impact at the earliest stage possible so as to minimize to the greatest degree possible any adverse environmental consequences. (*Aldrich v Pattison,* 107 AD2d 258, 263.) These procedures first require the agency to determine whether the project would have a significant effect on the environment and, if so, to prepare a draft environmental impact statement (DEIS) on the project's anticipated environmental effects. This DEIS is circulated and a public hearing held on it. The agency then prepares and circulates a final environmental impact statement (FEIS) which reflects the public comments. On the basis of the FEIS, the agency is then to make specific environmental findings before approving the project.

As to its substance, the purpose of the FEIS is "to provide detailed information about the effect which a proposed action is likely to have on the environment, to list ways in which any adverse effects of such an action might be minimized, and to suggest alternatives to such an action so as to form the basis for a decision whether or not to undertake or approve such action."

(ECL 8-0109 [2].) The act broadly defines "[e]nvironment" to include "land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance, existing patterns of population concentration, distribution, or growth, and existing community or neighborhood character." (ECL 8-0105 [6].)

The act also takes a hard stand on the State or local agencies' obligations to mitigate adverse effects, requiring that they "use all practicable means to realize the policies and goals set forth in this article, and * * * choose alternatives which, consistent with social, economic and other essential considerations, to the maximum extent practicable, minimize or avoid adverse environmental effects, including effects revealed in the environmental impact statement process." (ECL 8-0109 [1].)

It is apparent that the role of the FEIS is not merely to serve as a disclosure statement of the environmental impact of a project, but, more importantly, it serves as "an aid in an agency's decision making process to evaluate and balance the competing factors" (*Matter of Town of Henrietta v Department of Envtl. Conservation,* 76 AD2d 215, 222), and an aid in choosing those alternatives which, consistent with the goals of the project, to the maximum extent practicable minimize the adverse environmental effects.

To effectuate the statute's language of administering the State's policies "to the fullest extent possible" (ECL 8-0103 [6]), the courts of this State have required literal compliance with the procedural requirements of SEQRA. (*Aldrich v Pattison,* 107 AD2d 258, 264, *supra; Matter of Environmental Defense Fund v Flacke,* 96 AD2d 862; *Matter of Rye Town/King Civic Assn. v Town of Rye,* 82 AD2d 474, 480, *appeals dismissed* 55 NY2d 747, *lv dismissed as untimely* 56 NY2d 985.)

The applicable judicial standard for reviewing an agency's substantive determinations on environmental matters is that standard of review typically applied to other article 78 proceedings. The courts will overturn an agency's determination only when they are arbitrary and capricious or unsupported by substantial evidence. (*Aldrich v Pattison,* 107 AD2d 258, 267, *supra; Matter of Environmental Defense Fund v Flacke,* 96 AD2d 862, *supra; Town of Hempstead v Flacke,* 82 AD2d 183, 187.) This standard of review also incorporates the general rule of giving deference to the exercise of reasonable discretion by administrative agencies and does not permit the court to determine the merits of the project. However, the court is obliged to determine whether the agency has complied with the applicable law, identified the relevant areas of environmental concern,

taken a "hard look" at them and made a reasoned elaboration of the basis for its determinations. (*See, Aldrich v Pattison, supra,* at p 265, and cases cited therein.) So long as the agency has taken this "hard look", the court will not substitute its own determinations and thereby intervene in the area of discretion granted the agencies. (*Coalition Against Lincoln W. v City of New York,* 94 AD2d 483, 492, quoting *National Resources Defense Council v Morton,* 458 F2d 827, 838.)

In applying this standard of review to the procedural and substantive challenges made herein, we have concluded that there has been literal compliance with the procedural requirements of SEQRA, and that UDC has taken the prerequisite "hard look" analysis at the environmental impact of its Project, and has arrived at a well-reasoned conclusion in approving this Project. We address first one of UDC's major arguments on appeal, that the court below incorrectly held that UDC's analysis of the Project's impact on the water tunnel was inadequate, arbitrary and capricious.

It was not until UDC solicited comments on the FEIS that petitioners addressed the possible impact the Project's construction could have on the water tunnel located on Sixth Avenue. Even then, no technical analysis or supporting facts were provided to suggest any real dangers to the tunnel. UDC took notice of this last-minute reference to the tunnel but decided that no supplemental EIS would be needed and that the Project's approval should not be delayed. In making this decision UDC relied on a number of facts. The New York City Bureau of Water Supply, whose opinion had been sought with reference to the city's water system, had expressed no concern about any impact on the water tunnel and did not even suggest the need to conduct a further study of any potential impact. The tunnel itself is constructed in bedrock, 220 feet below the surface of Sixth Avenue, and lies more than 600 feet from the nearest point of the Project area. Also, since the construction of the tunnel, numerous office buildings have been constructed within the past decade directly adjacent to the water tunnel on Sixth Avenue. Finally, the UDC was aware that, as proposed, this project required little or no blasting.

In contrast to these established facts, petitioners presented no evidence of any potential adverse impact the Project would have on the water tunnel. In applying as we must a rule of reason to our review of the sufficiency of the FEIS on this issue, we note that although the consequence of damage to the water tunnel could be catastrophic for the city, we cannot be guided by an

inchoate, unsubstantiated fear of such a catastrophe. Instead, we must objectively evaluate the issue according to the evidence gathered. This evidence substantially supports the conclusion of UDC that a further study was unnecessary. We find that UDC took a "hard look" at this issue and has given a reasoned elaboration of its decision not to conduct a further study.

Petitioners further contend that Special Term erred in concluding that UDC violated SEQRA when it changed the configuration of the hotel to be built on one of the Project's sites without permitting the public to voice its opinion with respect to this "different hotel configuration". Accordingly, the court gave UDC the option of adhering to the original hotel plan or submitting the changes to public scrutiny.

After issuance of the FEIS but before project approval, UDC decided to eliminate 100,000 square feet of office space and to increase the number of guest rooms in the hotel from 550 to 750; it also added retail space and 25 additional parking spaces. The over-all height and bulk of the hotel was to remain unchanged. Although these changes were not included in the FEIS, the public was advised that the configuration of the hotel and its uses might change. After deciding upon these changes, UDC asked its Project team and consultants to determine whether the changes would have any significant environmental impact so as to require preparation of a supplemental EIS. Due to the unchanged nature of the size of the hotel, there were no significant visual, land use, or energy impacts expected. Traffic and air quality consultants also determined that no significant impact on traffic or air quality would occur as a result of these changes. Thus, after taking a hard look at all possible potential impacts, UDC concluded that no significant impact would occur and no supplemental EIS would be required.

It can hardly be said that this decision was arbitrary and capricious or unsubstantiated, given the good-faith effort with which UDC undertook to evaluate the possible environmental significance of the changes, the degree of care with which it studied these changes and the data upon which its decision not to supplement the FEIS was based. UDC fully satisfied its obligations under SEQRA with respect to the hotel changes. Because the public's right to comment is triggered by an agency determination of a significant environmental impact and none existed here, the UDC did not violate SEQRA by not submitting such changes to public scrutiny. Thus, we reverse those portions of the judgment requiring UDC to prepare a supplemental EIS on the water tunnel, and preventing it from implementing

minor and environmentally insignificant changes to the hotel and enjoining the Project's construction on these grounds.

However, we agree with Special Term's rejection of the arguments raised by cross-appellants Rosenthal *et al.*, concerning the traffic and air quality analysis. These arguments can be treated summarily. On the question of the public's participation in the Project's air pollution analysis, our review of the record reveals no instance in which the UDC provided less opportunity for public input than is required by SEQRA, and in fact we have found that UDC provided opportunity beyond that required by SEQRA. Moreover, the FEIS contained detailed explanations of the methodology used to analyze the impacts on traffic and air quality, and no relevant materials were hidden from the public's view. Similarly, petitioners' contentions of omissions and errors in the analysis of traffic and air quality impacts must fail. UDC did evaluate the impact of traffic to be generated by the new Jacob Javits Convention Center and took into account the proposals to build a garage for the center, which would require its own environmental study. UDC also considered the possibility of a city-sponsored 42nd Street Transitway, which is in the proposal stage, and which itself must accommodate to environmental concerns and to the impact of this city-approved Project. Contrary to petitioners' argument, UDC employed the most appropriate computer model existing at the time for its calculations of automobile emissions, which calculations were reliable.

With regard to the obligation to mitigate the Project's adverse effects on traffic and air quality, UDC compiled detailed information and proposed extensive mitigative measures to minimize those adverse impacts and to meet the Federal Clean Air Act's standard for acceptable carbon monoxide levels. As part of its hard look at this problem, UDC analyzed the traffic impact for both the Project's area and a large surrounding area. It adopted a "worst case" analysis, which included assuming peak hour traffic, simultaneous full use of all theaters, no diversion of traffic to less congested streets, and no increased enforcement of traffic regulations, to arrive at a very conservative model for traffic analysis. This same analysis was the basis for the air quality assessment.

To meet the expected adverse impacts, UDC studied and then proposed a multitude of mitigative measures which would place the area within Federal and city guidelines on carbon monoxide levels and which in fact are expected to produce lower carbon monoxide concentrations than presently exist. Our review of UDC's analysis of the traffic and air quality impacts assures us

that UDC identified the adverse traffic and air quality impacts, took a hard analytical look at them and proposed mitigative measures which, it had a reasonable basis to conclude, would in fact minimize those adverse effects. Special Term, therefore, correctly deferred to the judgment of UDC in this area.

The court also properly determined that there was no merit to petitioners' claim that UDC's analysis of historical and archaeological impacts was inadequate under SEQRA. In view of the fact that one of the components of the Project involves the preservation and restoration of the historically significant theaters on 42nd Street, an analysis of the area's historic resources looms large in the FEIS. As to archaeological interests, the UDC consulted, as it was entitled to, with the New York State Commissioner of Parks, Recreation and Historic Preservation and the New York City Landmarks Preservation Commission. It learned that the area had long ago lost any archeologically significant structures and the Project would have no adverse archaeological impact. Thus, the UDC reasonably decided against conducting any further study of this issue. Petitioners, while they challenge the lack of an archaeological study in the FEIS, fail to point out the existence of any significant archaeological concerns within the Project's area.

Thus, the Rosenthal petitioners have failed to demonstrate that the UDC has acted arbitrarily and capriciously or that it has failed to substantiate its conclusions on any of these issues. Accordingly, the Rosenthal petition should be dismissed in its entirety.

The Jackson petitioners raise a quite different challenge to the FEIS. They argue that the FEIS was deficient in not specifically studying the effect the Project would have on the elderly citizens of Clinton and in not incorporating in the FEIS effective measures to mitigate the expected displacement of Clinton's poor as a result of the increased pressures from gentrification. The Clinton community is one of the secondary impact areas adjacent to the proposed project which was the subject of considerable study by UDC. It is a low to moderate-income residential neighborhood known for its rich history and ethnic heritage. Even without the Project the area has already experienced increasing pressures for development and gentrification, a process one court has defined as "a trend whereby previously 'underdeveloped' areas become 'revitalized' as persons of relative affluence invest in homes and begin to 'upgrade' the neighborhood economically. This process often causes the eviction of the less affluent residents who can no longer afford the increas-

ingly expensive housing in their neighborhood." (*Business Assn. of Univ. City v Landrieu,* 660 F2d 867, 874, n 8 [3d Cir 1981].) This pressure can be expected to continue in Clinton, regardless of whether the Project is built or not. UDC concedes, however, that the Project will accelerate the pressures toward gentrification and has identified this as a major concern.

Recognizing that most of the efforts to displace low-income residents of Clinton will involve illegal tactics such as harassment, arson, illegal construction and encouragement of drug dealing and burglaries, UDC has adopted mitigative proposals aimed at strengthening antiharassment provisions and has agreed to support the construction or rehabilitation of low and moderate-income housing and to establish a committee to meet periodically with community representatives during all stages of the Project to mitigate the negative impacts of the Project's construction on Clinton residents. UDC also points out that the Governor of New York and the Mayor of New York City have announced their commitment to work together to seek millions of dollars to help preserve low and moderate-income housing in Clinton and to carry out other mitigative measures to assist this community.

The Clinton community has thus been identified as an area in need of preservation, and considerable attention has been given to ways to mitigate the community's problems. Although not adopted as a mitigative measure, the FEIS also considered the possibility of using developer funds to establish more low-income housing in Clinton. However, funds to be generated by the Project have already been earmarked for the restoration of the theaters and the subway improvements. Without these funds these two primary goals of the Project would not be realized. UDC concluded that there would not be any surplus funds available to mitigate the Project's secondary impacts, even though the Project had secured the maximum commitments obtainable from the developers.

It is regrettable that no surplus funds will exist to invest in the Clinton community, but the decision to use those funds to upgrade a deteriorating and unsafe subway system and to renovate theaters was rationally based, serves a worthy public purpose and was not arbitrary or capricious. It is important in this regard to keep in mind that SEQRA "leaves room for a responsible exercise of discretion and does not require particular substantive results in particular problematic instances." (*Matter of Town of Henrietta v Department of Envtl. Conservation,* 76 AD2d 215, 222, *supra.*) We conclude that UDC fully complied

with SEQRA in identifying the gentrification problem in Clinton, studying various mitigative measures, and choosing those which, consistent with the Project's goals, would minimize the adverse impacts to the maximum extent practicable.

The Jackson petitioners also argue that the FEIS improperly neglected to analyze the distinct problems of the elderly poor in Clinton. We are certainly not unmindful of the fact that the elderly poor may have problems associated with displacement which are unique from the problems of other groups. However, the same can be said of other groups, such as children, who may be uprooted from familiar schools and moved from safe living quarters to inadequate living quarters, or of racial minorities, who face additional problems of racism in seeking new living quarters. The bottom line is that displacement from one's home is a serious threat with harsh ramifications for any poor person and the FEIS did not ignore this. While the FEIS did not address all the specific and idiosyncratic adverse consequences to be suffered by the various subgroups of Clinton as a result of gentrification, it recognized the seriousness of displacement and proposed various mitigating measures to minimize those displacement effects. The adverse effects the Project could have on Clinton's elderly poor were adequately dealt with in UDC's overall discussion of the Project's secondary impact on Clinton. The court below properly dismissed the Jackson petition in its entirety.

Judgment of the Supreme Court, New York County (Robert E. White, J.), entered July 12, 1985, unanimously modified, on the facts and the law, to reverse decretal paragraphs two through seven, which had enjoined the construction of the Project, directed UDC to conduct a further environmental study of the Project's impact on the water tunnel and directed it to make no further changes on the Project without submitting them to public scrutiny, and the judgment is otherwise affirmed, without costs and without disbursements.

SANDLER, J. P., ASCH, MILONAS and KASSAL, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered on July 12, 1985, unanimously modified, on the facts and the law, to reverse decretal paragraphs two through seven, which had enjoined the construction of the Project, directed UDC to conduct a further environmental study of the Project's impact on the water tunnel and directed it to make no further changes on the Project without submitting them to public scrutiny, and the judgment is otherwise affirmed, without costs and without disbursements.