Stephen F. WILDER, Brandan Gill, Imre J. Rosenthal, Stephen Rosenthal, Robert Neuwirth, Lori Jean Saigh, and the Whitby Tenants' Association, Plaintiffs,

v.

Lee M. THOMAS, as Administrator of the United States Environmental Protection Agency, et al., Defendants.

No. 85 Civ. 8356.

United States District Court, S.D. New York.

May 13, 1987.

**1502**

LeBeouf, Lamb, Leiby & MacRae, Norman Dorsen, New York City, for plaintiffs.

Berle, Kass & Case, Frederick A.O. Schwarz, Jr., Corp. Counsel, Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Robert Abrams, Atty. Gen. of State of N.Y., New York City, for defendants.

## OPINION

GRIESA, District Judge.

This is an action arising out of the proposed 42nd Street Development Project. It is brought under the Clean Air Act, 42 U.S.C. §§ 7401, *et seq.*, specifically under the so-called "citizen suit provision" of the Act, 42 U.S.C. § 7604(a)(1).

Plaintiffs are individuals who live and work in the project area. A tenant's association is also named as a plaintiff. Defendants are various state and local agencies and officials involved with the Project. Originally plaintiffs sued certain federal defendants, but the claims against them have been withdrawn.

The original complaint was dismissed on June 26, 1986 for failure to state a valid claim. The court granted leave to amend, specifying what must be contained in an amended pleading. Plaintiffs then circulated a proposed amended complaint. Defendants objected, claiming that it was again inadequate. Plaintiffs have now briefed their motion to file the amended complaint, and defendants have briefed their opposition.

Although leave to amend should be granted freely, *see* Fed.R.Civ.P. 15(a), a court may refuse to grant leave to refile where it is clear that the amended complaint, if filed, would be dismissed. *Fo-* *man v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *M & T Chemicals, Inc. v. International Business Machines Corp.,* 403 F.Supp. 1145, 1147 (S.D.N.Y.1975), *aff'd,* 542 F.2d 1165 (2d Cir.), *cert. denied,* 429 U.S. 1030, 97 S.Ct. 656, 50 L.Ed.2d 637 (1976).

Normally, on a motion such as the present one, the question would be the legal sufficiency of the amended complaint on its face. Here, however, both sides have referred to certain matters outside the complaint, and it is obvious that these matters must be considered in order to dispose of the present motion. Both sides agree on what is properly before the court.

## THE COMPLAINT

The complaint alleges that the New York State Urban Development Corporation ("UDC") is a corporate governmental agency created under New York law and that UDC intends to construct the Project through a subsidiary (par. 11). It is alleged that UDC, in cooperation with City agencies, has prepared a plan covering 13 acres north and south of 42nd Street between Broadway and Eighth Avenue, and that the Project, if built, will fundamentally change the character of the area, increasing the level of commercial activity and the level of vehicular traffic (par. 17). The complaint alleges that these changes will significantly increase the emissions of carbon monoxide, an air contaminant regulated under the Clean Air Act (par. 18). Pursuant to the requirements of the State Environmental Quality Review Act ("SEQRA"), N.Y. Envtl. Conserv. Law §§ 8–0101, *et seq.* (McKinney 1984), UDC prepared an Environmental Impact Statement ("EIS") addressing traffic, air pollution and other impacts of the Project (par. 19). Following the preparation of the EIS, the Project was approved on October 4, 1984 (par. 65). It is alleged that other projects have been developed or are planned in the area, including the Javits Convention Center, and that the combined effect of these projects will lead to environmental problems (par. 20).

The complaint refers to the fact that, pursuant to the Clean Air Act, the United States Environmental Protection Agency ("EPA") has established national primary ambient air quality standards for carbon monoxide. The standard relevant to the present case is the requirement that concentration of carbon monoxide in the air shall not exceed a level of 9 parts per million ("9 ppm") over an 8–hour period more than once a year, on and after December 31, 1987 (par. 21). The complaint further refers to the statutory requirement that each state must adopt a state implementation plan, or "SIP," which is to provide for implementation and enforcement of the established air quality standards (par. 22). 42 U.S.C. § 7410(a)(1). The SIP must include

> emission limitations, schedules, and timetables for compliance with such limitations, and such other measures as may be necessary to insure attainment and maintenance [of the air quality standards].

*Id.* at § 7410(a)(2)(B).

New York State has a SIP, which has been submitted in various stages. A revision dated January 1984 was approved by the EPA on June 17, 1985 (par. 23).

The complaint (par. 24) quotes the citizen suit provision of the Clean Air Act, that

> any person may commence a civil action on his own behalf ... (1) against any person ... who is alleged to be in violation of (A) an emission standard or limitation under [the Act]....

42 U.S.C. § 7604(a)(1).

The complaint further quotes the definition of "emission standard or limitation" relied upon by plaintiffs:

> (3) ... any condition or requirement under an applicable implementation plan relating to transportation control measures, air quality maintenance plans, vehicle inspection and maintenance programs or vapor recovery requirements....

*Id.* at § 7604(f).

The complaint notes the requirement of 42 U.S.C. § 7604(b)(1) that 60 days notice must be given to the EPA and others of the alleged violations prior to bringing suit,

and states that such notice was given by letter of February 8, 1985 (par. 25).

The complaint then sets forth six claims for relief. The first claim bears the title *"Failure to eliminate carbon monoxide 'hot spots' caused by the Project by 1987."* The first claim refers to the definition of "hot spot" in the SIP as any location with a potential to violate the carbon monoxide standard. The complaint notes that the SIP identifies certain hot spots in the vicinity of the Project and indicates that new hot spots may appear as conditions change or data improve (par. 27). The complaint alleges that it is a "condition or requirement" of the SIP that all carbon monoxide hot spots are to be eliminated by December 31, 1987, referring to the January 1984 SIP, p. 3–21, § 3.5.3 (comp. par. 28). It is further alleged that construction of the Project will "assure the continued existence" of hot spots in the Project area after the deadline of December 31, 1987 (par. 30). It is said that this will occur during construction of the Project, and also after completion of the Project because mitigation measures proposed by defendant UDC for the Project are not effective to eliminate hot spots in the project area (pars. 29–30). The various defendants are alleged to be responsible for this non-compliance with the SIP requirement of eliminating carbon monoxide hot spots by the end of 1987 (pars. 31–35).

The second claim for relief is given the title *"Failure to require Project air pollution mitigation measures to be effective."* The second claim is based on the following provision of the SIP:

> To further ensure that the carbon monoxide standard is attained in New York City, if an EIS for a project proposal identifies a violation or exacerbation of the carbon monoxide standard, then the City commits to assure that mitigating measures will be implemented by the project sponsor or City, so as to provide for attainment of the standard by December 31, 1987 and maintenance of it thereafter.

(p. 3–24, § 3.6(A)) (comp. par. 37). The complaint alleges that the City has not

committed to the necessary mitigation measures as required by this provision and that the various defendants have failed to perform their duty of obtaining such a commitment (pars. 39–42).

The third claim bears the title *"Failure to compute carbon monoxide emission reductions in prior years for Midtown Manhattan."* The third claim is based on the provision of the SIP that the State Department of Environmental Conservation

> will compute, for each pollutant, emission reductions achieved during the calendar year through implementation of control measures on permitted sources, area sources, and mobile sources. Actual reductions thus calculated will be compared with those predicted in the SIP. Shortfalls, if any, will be discussed as to their effect on RFP [Reasonable Further Progress] in future years.
>
> \*　\*　\*　\*　\*　\*
>
> A summary of emission reductions resulting from control measures and other influencing factors will be prepared and a graphical comparison made between the growth and control line and the RFP line included in the SIP.

(p. 1–10, § 1.6). It is alleged that computations and summaries for a given year must be made by July 1 of the following year (par. 44).

It is alleged that these analyses are necessary for a rational assessment of the impact of the Project (par. 45). The complaint alleges that the required analyses for 1984 and 1985, due on July 1, 1985 and July 1, 1986 respectively, have not been prepared (pars. 46–49).

The fourth claim is entitled *"Failure to address Project interaction with other changes in West Midtown."* It is based on the SIP requirement that an annual report give "special attention" to significant changes in the West Midtown area and to any mitigating measures that might be necessary for that area (p. 3–25, § 3.6)(A)) (comp. par. 51). It is alleged that the EIS's for the various projects are to provide the underlying information (par. 51). The complaint alleges that these requirements have been violated, because there has been no "adequate assessment of future air quali-

ty" in the West Midtown area (par. 52). It is alleged that the various defendants did not require production of adequate materials for the Project's EIS, and did not render an adequate annual report regarding the interaction of this and other projects (pars. 53–56).

The fifth claim carries the title *"Effectiveness of carbon monoxide mitigation measures for Project not determinable."* This claim refers to the same provision of the SIP involved in the fourth claim (p. 3–25, § 3.6)(A)), requiring an annual report giving attention to changes in the West Midtown area and to any mitigating measures that might be needed for that area (par. 58). The complaint alleges that it is impossible to address the matter of mitigating measures "unless the carbon monoxide emissions ... and the effectiveness of mitigating measures on emissions reductions in past years can be computed or reported" (par. 59). It is alleged that the responsible agencies have failed to make the required computations and reports (pars. 60–61).

The sixth claim is entitled *"SIP evaluation of Project effect or emissions did not occur before Project approval."* This claim is based upon two provisions of the SIP. The first states:

> The primary mechanism for comprehensive evaluation of major projects which may have a significant impact on air quality is the environmental impact statement (EIS). EIS's are required by either the National Environmental Policy Act (NEPA), the State Environmental Quality Review Act (SEQRA), or the New York City Environmental Quality Review (CEQR).

(p. 3–23, § 3.6) (comp. 63). The second is the provision referred to in the second claim to the effect that, if an EIS for a project proposal identifies a violation of the carbon monoxide standard, then the City commits to assure that mitigating measures will be implemented so as to provide for the attainment of that standard (p. 3–24, § 3.6(A)). It is alleged that a "SIP review" must occur before approval of the EIS (par. 64). The complaint indicates that the SIP review is the responsibility of the

State Department of Environmental Conservation and the City Department of Environmental Protection (par. 68). The complaint alleges that, although the Project was approved by UDC on October 4, 1984, there was no review by either the DEC or the DEP until an inadequate review by the DEP on March 7, 1986 (par. 65).

In the prayer for relief, plaintiffs request a declaration that the planning for and approval of the Project has resulted in violations of the SIP; an injunction prohibiting defendants from proceeding further with the project; and a direction that the various defendants carry out their duties and responsibilities to enforce the SIP.

## DISCUSSION

An action under the citizen suit provision of the Clean Air Act must be based on an alleged violation of an "emission standard or limitation." 42 U.S.C. § 7604(a)(1)(A). The Act contains several definitions of "emission standard or limitation." The definition relied on by plaintiffs is:

> (3) ... any condition or requirement under an applicable implementation plan relating to transportation control measures, air quality maintenance plans, vehicle inspection and maintenance programs or vapor recovery requirements....

*Id.* at 7604(f). Thus, suit may be brought only for a violation of a condition or requirement, contained in a SIP, relating to transportation control measures, air quality maintenance plans, vehicle inspection and maintenance programs, or vapor recovery requirements.

An *air quality* standard established under the Clean Air Act is not an *emission* standard or limitation within the meaning of the citizen suit provision. *League to Save Lake Tahoe, Inc. v. Trounday*, 598 F.2d 1164, 1173 (9th Cir.), *cert. denied*, 444 U.S. 943, 100 S.Ct. 299, 62 L.Ed.2d 310 (1979). In order to sustain a citizen suit under the Act, a plaintiff must allege a violation of a specific strategy or commitment in the SIP and describe, with particularity, the respects in which compliance is deficient. *Council of Commuter Organizations v. Metropolitan Transpor-*

*tation Authority*, 683 F.2d 663, 670 (2d Cir.1982). The aims and goals of the SIP are not enforceable apart from the specific measures described in the SIP. *Action for Rational Transit v. West Side Highway*, 699 F.2d 614, 616 (2d Cir.1983).

### First Claim

The essence of the first claim is that the SIP requires elimination of carbon monoxide hot spots by December 31, 1987 and that the Project will prevent this from being accomplished.

The reference in the complaint to the SIP requirement is to chapter 3 of the January 1984 SIP, dealing with carbon monoxide. The chapter discusses the National Ambient Air Quality Standards, including the carbon monoxide standard of 9ppm maximum daily eight hour average (p. 3–8, § 3.3). The SIP describes the fact that the Clean Air Act at one time required that the standards be met by the end of 1982, but that, for carbon monoxide, the Act allowed an extension until 1987 to reach the standard in certain hard-to-achieve areas, such as New York City. For these cases, a 1982 "SIP submittal" was required (p. 3–1, § 3.1). New York's January 1984 SIP refers to hot spots and defines them as locations which have been shown to have a potential to violate the standard as of December 1982 (p. 3–8, § 3.3). The SIP contains a list of "candidate" hot spots in New York City, including two in the project area, 8th Avenue between 40th and 42nd Streets and 42nd Street between 7th and 8th Avenues (p. 3–4, table 3–1). It also states that other hot spots which "may surface" will be addressed on a continuing basis (p. 1–6, § 1.3). As to the 1982 hot spots, the SIP sets out a schedule for their control and the attainment of the standard.

The SIP describes the control measures to be used. These are mainly transportation control measures and vehicle inspection and maintenance plans, which are two of the types of conditions or requirements listed in the citizen suit provision of the Clean Air Act. 42 U.S.C. § 7604(f).

The SIP states that both the 8th Avenue and 42nd Street hot spots will be eliminated

at least by the end of 1987. The SIP asserts that, for New York City as a whole, control measures will be developed at a rate of at least 15 sites per year, and further states:

It should be emphasized, however, that all hot spots will be eliminated by the end of 1987.

(p. 3–21, § 3.5.3). It is this statement which is referred to in the complaint as constituting the SIP condition or requirement which gives rise to the first claim.

■ The first claim is legally deficient. It does not in fact allege a violation of the kind of condition or requirement which can give rise to a citizen suit under the Clean Air Act. The requirement that hot spots be eliminated by December 31, 1987 is in essence á restatement of the *air quality* standard established under the Act. It is not an *emission* standard. It is not a specific strategy or commitment as to how the air quality standard will be met. *See Commuter Organizations, supra,* 683 F.2d at 670. Finally, referring to the words of the statute, it is not a condition or requirement under the SIP relating to transportation control measures, or vehicle inspection and maintenance programs, or the other categories listed in the statute.

As already noted, in connection with carbon monoxide hot spots, the SIP does indeed contain certain conditions or requirements relating to transportation control measures and vehicle inspection and maintenance programs. However, the first claim makes no allegation of a violation in respect to these control measures.

The first claim is deficient for another reason. In alleging in a general way that the Project will prevent the elimination of hot spots in the area, the first claim fails to take into account that the SIP provides a mechanism for dealing with such a problem. The SIP provides that environmental problems must be identified in the EIS, and that the City commits, where necessary, to mitigating measures so as to ensure compliance with the carbon monoxide standard.

Since the first claim fails to refer to this remedial mechanism provided for in the SIP, the claim simply fails to reach the relevant issue. However, the second and sixth claims *do* refer to these provisions of the SIP, and allege a violation thereof. We turn to these claims.

*Second and Sixth Claims*

These claims should be considered together because they both refer to the EIS procedure and the commitment of the City to mitigation. As described earlier, the SIP provides that the primary mechanism for evaluating a project's impact on air identifies a violation of the carbon monoxide standard, the City commits to assure that mitigating measures will be undertaken so as to meet that standard (p. 3–24, § 3.6(A)).

It is appropriate to deal first with the sixth claim. This claim alleges that the State Department of Environmental Conservation and the City Department of Environmental Protection had a duty to conduct a "SIP review" of the Project before its approval. It is alleged that UDC approved the Project on October 4, 1984 and that neither agency reviewed the EIS until the DEP conducted some review (allegedly inadequate) on March 7, 1986.

■ The sixth claim states no valid cause of action. The complaint cites no requirement in the SIP that the DEC and the DEP, or either of these agencies, is required to make a "SIP review" of a project prior to the time that an entity such as the UDC approves it. The complaint refers to no provision of the SIP defining what is meant by "SIP review." The provision in the SIP relied on in the sixth claim states that the City commits, under certain circumstances, to assure mitigation of negative environmental consequences of a project. However, this provision offers no basis for the allegations in the sixth claim.

This brings us to the second claim, which raises an alleged problem regarding the City's commitment.

It is necessary to pay close attention to the precise wording and meaning of the SIP provision involved and also to scrutinize closely what is alleged by way of violations of that SIP provision. The SIP provision reads:

To further ensure that the carbon monoxide standard is attained in New York City, if an EIS for a project proposal identifies a violation or exacerbation of the carbon monoxide standard, then the City commits to assure that mitigating measures will be implemented by the project sponsor or City, so as to provide for the attainment of the standard by December 31, 1987 and maintenance of it thereafter.

(p. 3–24, § 3.6(A)). The complaint alleges (and this is apparently true) that there is a finding in the EIS that the effect of the Project will be to prevent the achievement of the carbon monoxide standard in the area without the implementation of mitigation measures (par. 38).

The complaint goes on to state that the SIP has been violated because the "City's commitment to mitigation measures" does not include measures which are effective to achieve the reduction in carbon monoxide emissions necessary to attain the air quality standard (par. 39).

As to the various groups of defendants, the complaint alleges that the State defendants—UDC, DEC, and certain officials of these entities—have violated the SIP "by failing to commit to, or seek the City's commitment to, the implementation of effective mitigation measures" (par. 40). The complaint alleges that the City defendants—the DEP and its commissioner, as well as the Mayor—have violated the SIP by permitting the Project to proceed despite a violation of the requirement "that a commitment to the implementation of effective mitigation measures must be included in the Project" (pars. 41–42).

In viewing these various allegations, it must be kept in mind that the relevant SIP provision *contains the commitment* by the City with regard to necessary mitigation measures. The operative language is, "the City commits." There are no challenges to the concept that the SIP, being a plan adopted by the State of New York pursuant to federal statute, can validly contain a commitment on the part of an entity under the jurisdiction of the State—*i.e.*, the City of New York. Thus, as far as the record in this case shows, the SIP contains and constitutes the commitment by the City to assure the necessary mitigation measures.

■ This means that the allegations (pars. 40–42) about various defendants failing to commit, or failing to seek the City's commitment, or failing to have a commitment included in the Project, are based on an incorrect premise—*i.e.*, that something else besides the SIP is needed to make the necessary commitment on the part of the City. These paragraphs state no valid claim.

In order to assert a legally sufficient claim for violation of this SIP provision, it would be necessary to allege a repudiation by the City of its commitment or a failure of the City to fulfill its commitment. Also, these allegations would need to be related to the specific items which can be the subject of a citizen suit under the Clean Air Act—*i.e.*, transportation-control measures, air quality maintenance plans, vehicle inspection and maintenance programs or vapor recovery requirements. 42 U.S.C. § 7604(f). The allegations would need to be made with particularity. *Commuter Organizations, supra,* 683 F.2d at 670.

Paragraph 39 of the complaint is the only attempt at such an allegation. However, it is inadequate. It simply states in the most general manner that the City's commitment "does not include mitigation measures which are effective to achieve" the necessary air quality standard. There is no specific allegation of any particular act or omission of any kind on the part of the City. There is no allegation of any act or omission of the City in relation to the items specified in the citizen suit provision.

For these reasons, it must be concluded that none of the allegations in the second claim makes out a valid cause of action.

However, the parties have referred to certain matters outside the complaint in connection with the second claim. It is appropriate to deal with the issues thus raised. The UDC approval of the Project on October 4, 1984, referred to later in the complaint (par. 65), was accompanied by certain findings by UDC made pursuant to SEQRA, the New York statute dealing with the environmental impact statement

process. The UDC findings and approval came after publication of the draft and final EIS and public comments thereon.

In its findings of October 4, 1984 UDC noted that the Project would generate substantial additional traffic and congestion and that, without traffic mitigation, these circumstances would cause violations of the eight-hour carbon monoxide standard of 9 ppm at several locations in 1991 (UDC Findings pp. 22–23, 26). However, the UDC findings stated that mitigation measures had been incorporated into the project plan, as follows:

> To counter these impacts, a series of mitigation measures has been incorporated into the project plan. These measures, the impact of which has been quantitatively evaluated in the same manner as the mitigated traffic impacts discussed above, include (a) a new traffic lay-by lane on the east side of Eighth Avenue between 40th and 43rd Streets to provide standing and drop-off space for buses and taxis that now block the eastern lane of Eighth Avenue for this purpose; (b) a relocation of the Port Authority taxi stand on the west side of Eighth Avenue (combined with an appropriate no standing restriction) to facilitate left turns onto westbound 42nd Street; (c) revised and effectively enforced no standing regulations on Seventh Avenue between 41st and 45th Streets (or, alternatively, a parital re-routing of traffic from Seventh Avenue onto Broadway between 45th and 41st Streets); (d) revised signal timing and no-standing regulations on 42nd Street to facilitate through traffic and right turns onto both Eighth Avenue for westbound vehicles and Seventh Avenue for eastbound vehicles; (e) additional enforcement of the foregoing measures by City traffic control agents, for whom space will be provided within the project area; and (f) revised signal timing on 43rd Street to improve crosstown flows.

UDC Findings p. 23. UDC found that, with these mitigation measures, there would be no violation of the 9 ppm carbon monoxide standard (p. 26).

On November 9, 1984 the New York City Board of Estimate adopted the UDC's findings and approved the project.

The Board of Estimate referred to the environmental findings of UDC, and UDC's incorporation of mitigation measures, in the preamble to the resolution:

> WHEREAS, on October 4, 1984, UDC found (i) that all requirements of the State Environmental Quality Review Act ("SEQRA") applicable to the Project have been met and satisfied, (ii) that consistent with social, economic and other essential considerations from among the reasonable alternatives thereto, the Project is one which minimizes or avoids adverse environmental effects to the maximum extent practicable, including the effects disclosed in the final environmental impact statement, and (iii) that consistent with social, economic and other essential considerations, *to the maximum extent practicable, adverse environmental effects revealed in the environmental impact statement process will be minimized or avoided by incorporating as conditions to the Project those mitigative measures which were identified as practicable;* ... (emphasis added)

The Board then resolved:

> (2) RESOLVED, That the Board of Estimate, having considered the matters referred to in the UDC Findings, concurs in and adopts the UDC Findings; ...

In their memorandum on the present motion, plaintiffs contend that, even if UDC's mitigation measures are adequate, developments since the time of the UDC and Board of Estimate approvals "strongly suggest that the City in fact has no plans to carry out the mitigation methods" adopted by UDC (Memorandum of August 29, 1986 p. 22). The sole support for this contention is plaintiffs' assertion that the City's Department of Transportation has announced that it is considering certain actions with respect to traffic on 42nd Street, specifically the possibility of making it a one-way street. Such a step would be inconsistent with item (d) of UDC's mitigation plan, which would revise certain signals and traf-

fic regulations to facilitate turns from 42nd Street onto both Seventh Avenue and Eighth Avenue. This phase of the UDC plan contemplates two-way traffic on 42nd Street. Plaintiffs assert that the City is now considering one-way traffic for 42nd Street.

In connection with this argument of plaintiffs, it must be borne in mind that the City's commitment in the SIP is generally to assure *whatever* mitigation is necessary to comply with the air quality standard. The SIP does not commit the City to any particular set of mitigation measures. Under the terms of the SIP, the City is not frozen into adhering to the details of the UDC plan. The Board of Estimate's approval of the UDC plan is certainly consistent with the City's obligation to assure mitigation, and this runs counter to any claim that the City is failing to honor its mitigation commitment. However, there is nothing to bar the Department of Transportation from considering alternative traffic measures. Nothing in the record indicates that the consideration of one-way traffic on 42d Street amounts to a repudiation of the City's commitment to mitigation or threatens non-performance of that commitment.

With regard to the mitigation measures adopted by UDC, plaintiffs' memorandum contends, although not strongly, that these measures are ineffective (Memorandum p. 23 n. 18). This argument is foreclosed by a state court ruling.

Certain of the plaintiffs in the present case brought an Article 78 proceeding in the state court to review, among other things, UDC's analysis of the Project's impact on traffic and air quality in the EIS and UDC's findings and approval of the Project. The trial court dismissed these claims. The Appellate Division and the Court of Appeals affirmed this ruling. *Jackson v. N.Y. State Urban Development Corp.*, 110 A.D.2d 304, 494 N.Y.S.2d 700 (1st Dept.1985); *aff'd*, 67 N.Y.2d 400, 503 N.Y.S.2d 298, 494 N.E.2d 429 (1986). The Appellate Division noted that UDC had "proposed extensive mitigative measures to minimize those adverse [traffic] impacts and to meet the Federal Clean Air Act's standard for acceptable carbon monoxide levels." 110 A.D.2d at 311, 494 N.Y.S.2d at 704. The court held that UDC had a reasonable basis to conclude that the mitigative measures "would in fact minimize those adverse effects." *Id.* The Court of Appeals expressly approved and affirmed this holding. 67 N.Y.2d 426, 503 N.Y.S.2d at 311, 494 N.E.2d at 442. Plaintiffs are barred from re-litigating the adequacy of the UDC mitigation measures, since the issue was decided in the *Jackson* case.

*Third Claim*

The provision of the SIP relied on in the third claim was quoted earlier, but will be restated. The SIP provides that the State DEC

> will compute, for each pollutant, emission reductions achieved during the calendar year through implementation of control measures on permitted sources, area sources, and mobile sources. Actual reductions thus calculated will be compared with those predicted in the SIP. Shortfalls, if any, will be discussed as to their effect on RFP [Reasonable Further Progress] in future years.

\* \* \* \* \* \*

> A summary of emission reductions resulting from control measures and other influencing factors will be prepared and a graphical comparison made between the growth and control line and the RFP line included in the SIP.

(p. 1–10, § 1.6). These computations and summaries are to be included in an annual report furnished by the DEC to the EPA by July 1 of the year following the year covered by the report. *Id.*

The complaint notes that in the May 1979 SIP there was a series of graphs showing a comparison of certain data about carbon monoxide emissions over a period of time with the so-called RFP line regarding such emissions (May 1979 SIP, p. III–19 *et seq.*) (comp. par. 45). One of these graphs was for Midtown Manhattan. The presentations were in terms of tons per day of emissions for the area covered by the particular graph. It is alleged that trends regarding carbon monoxide emissions are needed for a rational assessment of the

impact of the Project and of necessary mitigation (par. 45).

The complaint alleges that the DEC has not computed or reported carbon monoxide emissions reductions for Manhattan or for Midtown Manhattan for the year 1984 or the year 1985 (pars. 47–49).

At a conference with counsel held on May 11, 1987, the court requested a further specification of what is complained of in the third claim. It now appears that plaintiffs concede that reports were filed by the DEC with the EPA pertaining to the years 1984 and 1985. For the year 1984 there may have been a draft report followed by a final report responding to EPA criticisms. In any event, reports for the years in question have been filed. What is complained about is as follows: *First,* plaintiffs assert that neither of the reports contains the kind of graphs included in the May 1979 SIP, and allegedly contemplated in the language of the January 1984 SIP quoted above. *Second,* the emissions reductions are not shown for each separate control measure.

With respect to the second point, plaintiffs simply misconstrue the SIP. It would seem clear that there is no requirement that separate calculations be made for each individual control measure. It is patently impossible to determine separately what emission reductions result from changing parking rules, from traffic signal changes, etc.

With regard to the graphs, defendants concede that the 1984 and 1985 reports do not contain the kind of graphs displayed in the May 1979 SIP. However, defendants argue that, with regard to carbon monoxide, it has become apparent that the meaningful measuring process relates to specific locations, because carbon monoxide generally involves localized problems and is addressed by localized measures. Indeed, the relevant localities are often particular streets or particular blocks. Thus, according to defendants, the graphs about tons per day of emissions relating to large areas, presented in the May 1979 SIP, have been found not to be meaningful, and the method of reporting in the 1984 and 1985 annual reports has been adjusted to take

account of these realities, all of which has the concurrence of the EPA.

What has just been discussed has been set forth, not in order to make factual findings on these issues, but to throw light on the legal issue which will now be addressed. The basic question regarding the third claim, as with the other claims, is whether plaintiffs state a valid cause of action for violation of a condition or requirement of the SIP in relation to any of the four subjects referred to in the statute—*i.e.,* transportation control measures, air quality maintenance plans, vehicle inspection and maintenance programs or vapor recovery programs.

■ There is no doubt that the reporting requirements of the SIP are a most important feature of the SIP. However, at no place in plaintiffs' amended complaint, in their memorandum, or at oral argument do plaintiffs attempt to allege that the reporting requirements referred to in the third claim fall within any of the four statutory subjects. The court concludes that the kind of reporting of data about emissions, which is the subject of plaintiffs' objections, is not a condition or requirement relating to transportation control measures or any of the other statutory categories.

It should be borne in mind that the third claim, as now defined by plaintiffs, deals with the technical refinements as to the kind of data which should be included in the reports. This is a question that can well be left to the expertise of the EPA.

*Fourth Claim*

As summarized earlier, the fourth claim complains about the alleged lack of "special attention" in the annual report to new developments in the West Midtown area. It also alleges that the various defendants did not require production of adequate materials for the Project's EIS, which would then be the basis for the analysis in the annual report.

■ There are various deficiencies in the fourth claim. In the first place, there is no specification of which annual report is referred to. Also, as in the case of the third claim, plaintiffs make no contention

or argument that this reporting requirement is a condition or a requirement relating to any of the subjects referred to in the citizen suit provision of the Clean Air Act, and the court holds that it does not. Finally, insofar as the fourth claim attacks the sufficiency of the EIS and the material obtained in connection therewith, this allegation is barred by the State court action. *See Jackson, supra,* 67 N.Y.2d 400, 503 N.Y.S.2d 298, 494 N.E.2d 429, *affirming,* 110 A.D.2d 304, 494 N.Y.S.2d 700.

### Fifth Claim

This is another claim alleging failure to comply with the SIP requirements for the annual report. It is alleged that there has been a failure to give "special attention" to mitigating measures necessary for the West Midtown area.

As in the case of the preceding claims, plaintiffs have failed to allege or argue that this claim comes within the citizen suit provision of the Clean Air Act, and the court holds that it does not. To the extent that it raises an issue about mitigation measures for the Project, the matter is dealt with by the provision of the SIP committing the City to the necessary mitigation.

### Notice Requirement

The Clean Air Act specifies that a plaintiff must give 60 days notice to the EPA of alleged violations of a SIP before bringing a citizen suit. 42 U.S.C. § 7604(b). This notice provision is to be construed flexibly and realistically to carry out the purpose of having the EPA investigate and act upon an alleged violation. *Friends of the Earth v. Carey,* 535 F.2d 165, 175 (2d Cir.1976), *cert. denied,* 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977); *see also Natural Resources Defense Council, Inc. v. Callaway,* 524 F.2d 79, 84 n. 4 (2d Cir.1975).

In the present case plaintiffs did not give the EPA notice of all the items alleged in the amended complaint prior to the submission of that complaint. However, in mid-July 1986 the proposed amended complaint was circulated to all parties who were named as defendants in the ac-

tion, including the EPA. Obviously, many months have elapsed since that time. There has been ample opportunity for the EPA to .take action regarding the alleged violations of the SIP. A realistic application of the notice requirement in this case would not be achieved by rejecting the complaint for the technical failure to give a notice separate from the complaint. It is in the interest of justice to deal with the complaint on the merits.

### CONCLUSION

For the foregoing reasons, plaintiffs' motion to file and serve the amended complaint is denied. There is no indication that the deficiencies in plaintiffs' claims can be cured by further amendment. Leave to replead is not granted. The action is dismissed.

SO ORDERED.